Filed 4/26/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)
      v. )
)           S097189
JOHN MYLES, )
)    San Bernardino County
      Defendant and Appellant. )    Super. Ct. No. FSB10937
_____)

A jury convicted defendant John Myles and a codefendant, Tony Tyrone Rogers, of the first degree murder of Fred Malouf (Pen. Code, § 187, subd. (a)),[1] and found true the special circumstance allegations that the murder was committed while defendant and Rogers were engaged in the commission of robbery (§ 190.2, subd. (a)(17)(A)).[2] The jury also convicted defendant of the second degree robbery of two other victims (§ 211), and unlawful possession of a firearm (former § 12021, subd. (a)(1) (now § 29800, subd. (a)(1); Stats. 2010, ch. 711)).[3] In

---

[1] All further statutory references are to the Penal Code unless otherwise indicated; references are to the provisions effective at the time of trial.

[2] Outside of the jury's presence during the defense case, defendant admitted that he had suffered a prior felony conviction. As a result of that admission, the jury was not called upon to determine the truth of a "second strike" allegation pursuant to section 667, subdivisions (b) through (i), or to decide whether defendant was a felon for purposes of the felon-in-possession charge under former section 12021, subdivision (a).

[3] Codefendant Rogers also was convicted of one count of second degree robbery (§ 211), and the jury found true the allegations that he personally used a

*(footnote continued on next page)*

1

connection with the murder and robbery counts, the jury found true the allegations that defendant personally used a handgun. (§ 12022.5, subd. (a).)

In a separate, subsequent proceeding, the same jury convicted defendant of the first degree murder of Harry "Ricky" Byrd, and found true the special circumstance allegation that defendant had been convicted of more than one murder and the allegation that defendant personally used a handgun in the murder. (§§ 187, subd. (a), 190.2, subd. (a)(3), 12022.5, subd. (a).) After the penalty phase, it returned a verdict of death. Defendant moved for new trial (§ 1181), and for modification of his sentence to life without the possibility of parole (§ 190.4, subd. (e)). The trial court denied the motions and sentenced him to death.[4] Defendant's appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

---

*(footnote continued from previous page)*

handgun in the commission of the murder and the robbery (§ 12022.5, subd. (a)(1)). He was sentenced to life in prison without the possibility of parole consecutive to 10 years for the murder conviction.

[4] The court also imposed an aggregate determinate sentence of 44 years eight months, for the robbery and felon-in-possession convictions and firearm-use findings, but ordered all but 11 years four months of that term stayed pursuant to section 654. As discussed *post,* in part II.C.3., we order that the abstract of judgment be corrected in a minor respect with regard to the determinate term.

## I. FACTS

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

##### a. The murder of Harry "Ricky" Byrd[5]

Juli Inkenbrandt was a methamphetamine user. On April 11, 1996, she borrowed a neighbor's Buick sedan to drive her drug dealer friend, Jshakar Morris, and defendant to the West Side neighborhood in San Bernardino. They told her they needed to "collect some money." Morris sat in the front passenger seat and defendant, whom Inkenbrandt did not know, sat in the backseat behind Morris. Inkenbrandt's one-year-old daughter was in a car seat to the left of defendant in the backseat.

Inkenbrandt drove to an area known as California Gardens. As she headed down Magnolia Avenue, defendant directed her to pull up to a group of young men who were talking in the front yard of a house. Inkenbrandt stopped the car in the middle of the street and defendant yelled out of the left backseat window something to the effect of "You guys know Smoke?" They shrugged their shoulders and said, "No." One member of the group, Harry "Ricky" Byrd (Ricky), suggested to defendant that he "[g]o check on the dark side." The young men then resumed their socializing.

Defendant and Morris directed Inkenbrandt to continue driving. Unbeknownst to defendant and Morris, they passed Ricky's cousin, Gary Lee, who was standing outside talking with Darion "Smoke" Robinson.

---

**5**     As discussed more fully *post*, in part II.A.1., trial on the Ricky Byrd murder count was bifurcated from, and conducted subsequently to, trial on the charges stemming from the incident at the Pepper Steak Restaurant that occurred nine days after the Ricky Byrd shooting.

After several minutes of driving around, defendant directed Inkenbrandt to return to where the young men were gathered on Magnolia Avenue. Driving in the same direction as at the time of the initial encounter, Inkenbrandt pulled the Buick closer to the group as defendant instructed. Defendant again yelled to them from the left backseat window, this time asking whether they would "give Smoke a message for him." Ricky, who was leaning on the side of a friend's car that was parked between him and the Buick, replied, "Okay. What's the message?" Defendant reached over the baby in the car seat, pointed two guns out the window, and fired twice. The young men dropped to the ground for cover, and the Buick drove off. Ricky suffered a fatal gunshot wound to his upper chest. Another bullet struck the driver's seat headrest in the parked car.

As Inkenbrandt sped away from the scene at defendant's direction, they again passed Gary Lee and Darion Robinson, who were still outside talking. This time, defendant shot at them with what sounded to Lee like a .22-caliber revolver. The two men ducked behind a parked car until the Buick was gone. They then pursued their assailant by car, but lost sight of the Buick as it headed toward Interstate 215. However, Lee thought that he recognized the car and the driver, and he drove to an area where he believed he might find them.

When defendant's group arrived back at Inkenbrandt's apartment complex, defendant and Morris instructed her to park behind the buildings. Defendant then removed the shell casings from inside the vehicle and they left, telling Inkenbrandt to forget what she had seen. Inkenbrandt used the Buick to run some errands. On her return 15 to 20 minutes later she parked in her normal parking spot in front of the buildings. Shortly after her arrival, defendant and Morris ran up to her, asking for a ride to an area where they sold drugs. Inkenbrandt dropped them off as requested, then returned home, again parking in the front of the apartment complex.

4

At some point when the Buick was parked in front of the apartment complex, Lee and Robinson had driven by and located it. Seeing no one in the Buick, they returned to Magnolia Avenue, where they discovered that Ricky had been fatally shot. After hearing witnesses describe the car involved in that shooting, Lee realized that it was the same car from which shots had been fired at him. When Lee led police officers to where he had spotted the vehicle, it was no longer there. However, police were on the scene moments after Inkenbrandt returned to the apartment complex after dropping off defendant and Morris. A witness from the Magnolia Avenue shooting was sitting in the back of an unmarked police vehicle and he identified the Buick and Inkenbrandt as the driver. When police then contacted Inkenbrandt in her apartment, she told them what had happened from "the beginning to the end." As she explained at trial, she talked with the officers about the incident because she "wasn't going down for a murder I didn't commit that they were stupid enough to do."

Approximately three weeks after the shootings, two other eyewitnesses attended a live lineup and identified defendant as the gunman. They also identified him at trial. Inkenbrandt likewise identified defendant, first by photograph, then at a live lineup, and finally at trial. Although one other eyewitness to the shooting had never been asked to view a photographic array or attend a live lineup, he positively identified defendant at trial.

Investigating officers searching the area where Ricky was shot recovered a live .380-caliber round of ammunition and a spent .380-caliber shell casing. The .380-caliber round bore an "FC" headstamp and the casing had a Winchester headstamp. During the investigation of the shooting, a search of a room at the Phoenix Motel in San Bernardino yielded defendant's fingerprints and clothing, along with eight live .380-caliber rounds of ammunition, one live .22-caliber round, and two expended .22-caliber shell casings. One of the .380-caliber rounds

5

discovered in the motel room had an "FC" headstamp like the live round found at the scene where Ricky was shot. And ballistics testing showed that the bullet that killed Ricky was of the same variety as bullets in the live .380-caliber rounds found at the scene of the shooting and at the Phoenix Motel.

In connection with the subsequent shooting incident at the Pepper Steak Restaurant in nearby Colton, officers searched a vehicle parked in the lot of an apartment building in San Bernardino. They found inside the trunk a Lorcin .380-caliber semiautomatic handgun wrapped in a towel. Although the prosecution's firearms expert could not state conclusively that the bullet that killed Ricky had been fired from the Lorcin, he expressed the view that it could have been. The parties stipulated at trial that, if called to the stand, witnesses would testify that a person they believed to be defendant possessed a Lorcin semiautomatic handgun.

### b. Robbery Murder at the Pepper Steak Restaurant

Nine days after Ricky Byrd's murder, defendant, with 17-year-old Tony Tyrone Rogers, used a firearm to commit a robbery that led to another death.

On April 20, 1996, Fred Malouf (hereafter sometimes Fred), his wife Donna Malouf (Donna),[6] and Donna's mother went to the Pepper Steak Restaurant in Colton at around 8:00 p.m. for coffee. Donna was an employee of the restaurant and had worked the morning shift that day. Fred was a retired captain in the Colton Police Department.

After the Malouf party sat down in a booth at the back of the restaurant, a waitress named Krystal Anderson walked over to say hello. Donna testified at trial that moments later, defendant came running through the restaurant yelling,

---

[6]    At the time of trial, Donna Malouf had remarried and went by the name Donna Malouf Lawrence.

"It's a robbery. I'll shoot. Get your money out." He was holding a large semiautomatic gun in his right hand. A mask came across his mouth and nose, and he was wearing a beanie on his head.

Donna further testified that she immediately rose from the booth and started walking toward the kitchen because she knew that a gun was kept there. Before she reached her destination, however, defendant ran up and grabbed her by the hair. He yelled and cursed at her, wanting to know whether she was the manager and where the safe was located, and threatening to "blow [her] head off." Donna told him there was no manager and no safe. According to Donna's testimony, defendant was yelling so hard that his mask slipped below his nose, and she could see all of his face except for his mouth and the top of his head. He then wrapped his hand holding his gun around Donna's throat and dragged her by the hair into the kitchen.

Donna noticed that three other employees and the codefendant, Tony Rogers, were inside the kitchen. Rogers also was armed with a large semiautomatic gun, and he was wearing a hat but no mask. Defendant directed Rogers to shoot Donna if she moved, then left the kitchen and returned to the dining area. Several minutes later, Donna noticed Fred's face in the window of the kitchen's back door.

Rogers ran toward the back door just as Fred was entering. When Fred attempted to wrest control of Rogers's gun, a shot rang out. Donna saw Fred fall back into the women's restroom. Rogers then stood over Fred and shot him repeatedly. At some point, Fred managed to remove his gun from his ankle holster and shoot Rogers in the upper chest. Rogers screamed, "I've been shot," and ran past Donna to exit the kitchen and flee.

Other restaurant employees and patrons gave varying accounts of the sequence of events prior to the shooting. Krystal Anderson, the waitress who was

7

talking with the Maloufs at the outset of the robbery, testified that defendant dragged Donna by the hair and forced her into a booth, then pushed Anderson toward the cash register near the front of the restaurant by kicking her legs and hitting her. When Anderson had trouble complying with defendant's repeated demands to open the register, he hit her in the stomach with his gun. After she finally managed to open the register, defendant took out the money, which was mostly $5 and $10 bills. Defendant then reached into Anderson's apron and removed her tips. Another witness, Harold Lewis, was seated with his wife and grandson in a booth across from the cash register when defendant came into the restaurant waving his gun and demanding that everyone put their money on the table. According to his testimony, defendant first dragged Donna to the cash register before grabbing the other waitress. After taking the money from the till, defendant came up to Lewis, twisted Lewis's arm behind his back, and pointed the gun behind his ear. He then took the billfold and money that Lewis had placed on the table.

There were some discrepancies in the testimony of the eight witnesses regarding the events in the restaurant before the shooting. But the witnesses testified consistently that after the shots were fired, defendant first ran back to the door leading to the kitchen and then fled through the front door of the restaurant. Three witnesses further testified that they saw defendant point his gun in the kitchen's passthrough window and heard it click, but that the gun did not fire.

Officers responding to a dispatch regarding the robbery found Rogers hunched over on the sidewalk a short distance away. There was a semiautomatic handgun lying next to him. Rogers complained of a shotgun wound to the stomach and officers observed blood in his abdominal area. He was handcuffed and transported to the hospital, where he underwent emergency surgery. Officers

8

took Donna to view Rogers in the hospital, where she identified him as the shooter.

An autopsy showed that Fred was shot five times at close range, suffering gunshot wounds to his face, abdomen, knee, thigh, and wrist. The fatal wound was the gunshot to the abdomen, which caused a small hole in the aorta that led to massive internal hemorrhaging.

Officers investigating the crime scene discovered extensive evidence of gunfire in the kitchen area and restrooms, including 7 nine-millimeter cartridges, an expended bullet, and numerous bullet fragments. Ballistics testing on the nine-millimeter semiautomatic gun found next to Rogers at the time of his arrest showed that all of the cartridges found in the kitchen had been fired from his weapon.

In the early morning hours the day after the shooting, officers contacted Rogers's 22-year-old cousin, Earl Williams, who was allowing Rogers to live with him. Williams told the officers that Rogers associated with three large African-American men, one of whom he identified as J-Dog, the name by which defendant was known. Williams also took the officers to the San Bernardino apartment rented by Lateshia Winkler, where defendant occasionally stayed. Police then brought Williams to the police station to question him about his possible involvement in the crimes. He told officers that around 11:30 a.m. on the day of the shooting, defendant came to his apartment looking for Rogers, saying he needed "to talk to him about some cash flow." Williams told defendant that Rogers was socializing at a nearby apartment and defendant left. When he returned to Williams's apartment with Rogers a short time later, Williams overheard defendant telling Rogers that he had been watching two places for the last two days and "we got to hit them before 8 o'clock." Williams testified at trial that he did not recall most of what he had told the officers during the questioning.

9

Investigators also interviewed Lateshia Winkler, in whose apartment defendant occasionally stayed. According to Winkler, defendant, Rogers, and another man whom she did not know left her apartment between 6:00 and 6:30 p.m. on the evening of the shooting. Defendant returned around 10:00 p.m. alone, two hours later than the time he said he would be home, and went straight to his bedroom. He appeared to be high. Winkler followed him, asking for an explanation but defendant stated angrily, "Don't start. I've got a lot of shit on my mind." Defendant then left the apartment for about 30 to 45 minutes. Winkler also told officers that in a longer conversation later that same night, defendant stated that "his homeboy got shot in a robbery, either by somebody who worked there or somebody who was staking it out." The next day, while defendant was speaking with his mother by telephone, Winkler overheard defendant asking his mother, "What are they going to do?" and "Did he die?" Later, he told Winkler that his friend had been shot and was at a nearby hospital in police custody. Like Earl Williams, Winkler testified at trial that she did not remember most of what she told police during the interview.

Both Williams and Winkler told police that they previously had seen defendant carry a handgun. According to Winkler, defendant kept two loaded magazines on the headboard in his bedroom and stored the gun in the trunk of Winkler's 1973 Pontiac Firebird, which was parked in a lot close to her apartment. Police searched the trunk of her car and discovered a Lorcin .380-caliber semiautomatic handgun.

During the investigation, several eyewitnesses identified defendant as the masked man who entered the front of the restaurant waving a large firearm and announcing that a robbery was in progress. Donna picked defendant's picture from a photographic lineup, telling police she was "80 percent sure" that the photograph depicted the man who had forced her to go into the kitchen. She also

10

identified defendant in a live lineup conducted about one week after the photographic lineup, and later again at trial.

### 2. Defense evidence

#### a. Defendant's defense case

Defendant presented no evidence at the Ricky Byrd murder trial.

To cast doubt on the prosecution's evidence regarding the crimes at the Pepper Steak Restaurant, the defense called a number of the investigating officers who had interviewed prosecution witnesses. For example, to undercut the evidence that defendant left Winkler's apartment with Rogers at approximately 6:00 to 6:30 p.m. and returned alone and worried about his "homeboy," the defense elicited from Sergeant Mark Owens discrepancies in Winkler's various accounts of these events. Specifically, Winkler had told the officer that on the night of the crimes, defendant said only that his friend got shot while trying to commit a robbery and that it was not until the following day that defendant mentioned that one of his "homies" either killed somebody or got [himself] killed" by "some gang bangers."

The defense also emphasized the lack of physical evidence linking defendant to the crimes. Sergeant Owens informed the jury that in his search of clothing associated with defendant he never found a ski mask or black cap, gloves, dark running suit, or any other article of clothing described by the eyewitnesses. He confirmed that Winkler told him defendant had about $20 in $1 bills and coins either on the night of the robbery or the day after, and that he knew that only $5 and $10 bills had been taken from the restaurant's cash register. The defense also elicited from Officer Leroy Valadez that Harold Lewis reported to him that there was approximately $500 hidden inside the wallet that defendant took from him.

11

Testimony by other officers highlighted discrepancies in the eyewitnesses' descriptions of the robber's clothing and firearm. The defense also elicited from the officers that several of the eyewitnesses were unable to provide them with a description of the robber's facial features because his face was covered by a ski mask during the incident.

The defense further challenged the prosecution's identification evidence by presenting testimony by an eyewitness identification expert. Robert Shomer, Ph.D., described the various factors that reduce the accuracy of an identification, including life-threatening, unexpected and traumatic circumstances, age and racial differences between the eyewitness and the perpetrator, the manner in which the identification procedure is conducted, and the precision of the eyewitness's initial description. According to Dr. Shomer, the more stressors present, the more difficult it is to later identify a person. He also explained that the accuracy of an identification is further reduced when any substantial part of a person's face is covered, and that eyes are not a good feature for identifying a person because unlike ears, the mouth, the nose, and the hairline, eyes typically are not that distinctive.

### b. Codefendant Rogers's defense

Rogers offered his own account of events at the Pepper Steak Restaurant. Rogers testified that he left his apartment with G-Dog and someone named Dee to drive to someone else's house. He passed out as they drove around because he had been drinking beer and smoking marijuana. When he awoke, they were in the Pepper Steak Restaurant's parking lot and Dee told him, "Homies went inside." Rogers had to use the restroom. When he opened the door to what he thought was the restroom, a man "came out of nowhere" and shot him in the chest. In response, Rogers removed the gun that was tucked into his pants. When he and

12

the man struggled for his gun, it fired accidentally and then kept firing. He then ran out of the door to get help but passed out on the sidewalk. Rogers denied going into the restaurant to commit a robbery or to "back up" G-Dog.

According to Rogers, defendant was not involved in the robbery.

**B. Penalty Phase Evidence**

### 1. Prosecution's case in aggravation

The prosecution presented evidence that defendant committed six other criminal acts involving violence or a threat of violence, three of which occurred in the West Valley Detention Center where defendant was incarcerated while awaiting trial on the capital crimes. Family members of the murder victims testified about how they were affected by their loved ones' deaths.[7]

### a. Robbery at Denny's Restaurant

In October 1992, Mark Repman worked as the manager at the Denny's Restaurant in Victorville. Repman testified that around 11:30 p.m. on October 28, defendant and two other African-American men entered the restaurant armed with pistols and a shotgun. One of the men placed a gun to the back of Repman's head and ordered him to the office. Repman complied with the man's demand to open the safe, handing over about $1,200 in cash. Meanwhile, defendant pointed a shotgun at the restaurant customers and employees and ordered them down on the floor.

Deputy Sheriff Matthew Kitchen testified that he responded to the report of a robbery in progress by stationing his vehicle on the freeway on-ramp near the

---

[7]     Defendant was permitted to absent himself from the penalty phase after a pretrial hearing at which he indicated to the court that he did not want to "act out" or "cause a scene." (§ 1043, subd. (b)(1).)

13

restaurant.  He spotted a car that matched the description of the assailants' vehicle and a high-speed chase ensued.  When the suspects' car failed to negotiate a freeway exit and crashed onto an embankment, two of the men jumped out of the vehicle and ran toward the railroad tracks.  California Highway Patrol Sergeant Steven Urrea testified that he took defendant into custody along the tracks and found money and a shotgun under a nearby bush.  The parties stipulated that defendant was convicted of second degree robbery in connection with this incident.  (§ 211.)

### b.  Shooting of Shawn Boyd

Lieutenant Robert Miller of the Colton Police Department investigated a shooting that had occurred at the home of defendant's mother in February 1996. Miller testified that the victim, Shawn Boyd, told him that he was visiting defendant's mother on the evening of February 23.  Around 11:45 p.m., Boyd mentioned in conversation that he was doing well and had a job and new clothes. Defendant became jealous and agitated, telling Boyd to "get into the motherfucking room" and pointing to the master bedroom.  When Boyd resisted, defendant threatened to "plug" him.  He then shoved Boyd toward the bedroom, pulled out a handgun and shot him in the face.  Boyd ran through the bedroom and jumped from the second story through a glass window.  The prosecution's firearms expert at the guilt phases, William Matty, testified that the bullet recovered from the scene of that shooting was fired from the Lorcin handgun that was recovered from the trunk of Lateshia Winkler's car during the Pepper Steak Restaurant investigation.

### c.  Robbery at Thomas Realtors

Thomas Realtors is a San Diego property management company. According to Jacqueline Graff, who worked as a receptionist there in April 1996,

14

most of the tenants' rent payments came into the office on the 3d and 4th of each month. Graff testified that on April 3 around 2:20 p.m., two African-American men entered the office. One of them, whose description matched that of defendant, put a gun to her head and demanded that she open the desk drawer and give him all of the money. Graff explained that the owner had taken the money to the bank. However, she complied with the robber's demands to open all of the drawers and he rifled through them, saying, "Somebody is going to die if I don't get the money." The assailants then turned their attention to Graff's coworker, Paul Baumhoefner, who had come to the lobby to see what the commotion was about. Baumhoefner testified that the man with the gun held the weapon inches from his face, demanding money and backing him into his private office. Like Graff, Baumhoefner explained that the owner was on his way to the bank, and he opened all of his desk drawers to show that there was no money inside. He also pulled out a wad of money from his pockets, which the gunman grabbed before leaving the office and heading out the front door. Baumhoefner then retrieved the owner's gun from another desk and ran out the door in pursuit. He got into his truck and took off after a red sedan that bystanders had identified as the getaway car. Baumhoefner eventually pulled up behind the car and noted its license plate number, then returned to the office and reported the number to responding officers.

The commotion on the street near the scene of the robbery had attracted Thomas Stone's attention as he was driving by. Stone testified that he saw bystanders pointing at a red car, which he followed as it made its way down various streets and alleys. When the car stopped in an alley, a large African-American man emerged from the passenger side and started shooting at Stone as Stone tried to back up, hitting his vehicle in several places.

15

The parties stipulated that two days after the incident, police located a sedan with a license plate number matching the one reported by Paul Baumhoefner, and that one of the four latent fingerprints recovered from the vehicle was positively identified as belonging to defendant. The prosecution's firearms expert testified that the .380-caliber casings recovered from the scene of the shooting could have been fired from the Lorcin handgun, and that cartridges found in the alley were the same kind as those recovered from the scene of the Shawn Boyd shooting six weeks earlier.

### d. Jail incidents

Defendant was held at the West Valley Detention Center in Rancho Cucamonga while awaiting trial in the case. In December 1996, eight months after his arrest, he had a violent outburst during a "shakedown" search of the unit where he was being housed. Deputy Joseph Perea of the San Bernardino County Sheriff's Department testified that during the shakedown, when the inmates were lined up in front of their cells, defendant mumbled something under his breath as one of the deputies passed by him. Perea and another deputy took defendant to the multipurpose room and asked him to sit down, but defendant did not comply. When Deputy Mark James intervened and attempted to push defendant down into his chair, defendant punched him on the left side of the face, rendering him unconscious. Perea sprayed defendant with pepper spray, but defendant managed to throw a food cart at the officer, hitting him in the right arm. Defendant then ran to a utility room, grabbed a push broom and started swinging it wildly. The deputies managed to knock the broom out of defendant's hands by throwing plastic chairs at him, then attempted to tackle him, eventually getting defendant under control by handcuffing him and shackling his legs.

16

Defendant had a second violent confrontation with deputies five months later. According to the testimony of Deputy Timothy Nichols, in May 1997, Deputy David Llewellyn ordered defendant to go into his cell and "lock it down" for disrespecting one of the deputies. Defendant first disregarded the directive, then took a combative stance and responded, "Fuck you." Deputy Nichols sprayed him with pepper spray, but it had no effect. Defendant then stepped toward the deputies, and he and Llewellyn started hitting each other with their fists. When Nichols attempted to place defendant in a "choke hold," defendant threw him off and punched him repeatedly on the side of the head and in the groin as he tried to get up off the ground. Defendant then picked up Nichols and tried to throw him over the second-tier railing. After releasing his hold on Nichols, defendant resumed fighting with Llewellyn until he was subdued by other deputies.

A third incident occurred approximately one month before the start of the first guilt phase trial. Deputy Alejandro Barrero testified that in November 2000, he removed from defendant a sharpened metal instrument known as a "shank." The homemade shank had a cloth handle with a leash made of rope that would permit the user to retrieve the weapon in the event it slipped or was grabbed away.

### e. Victim impact evidence

#### i. Ricky Byrd's murder

Ricky Byrd's father, Harry Byrd III, told the jury that when he was informed of his son's death, he fell to his knees and dropped the telephone in disbelief. It was very difficult for him to see his son in a coffin. Although Byrd had not seen Ricky in person for a year or two before the murder, he had spoken to him the previous weekend and Ricky was planning to come to Northern California to visit him the following week.

17

Ricky Byrd's grandmother testified that Ricky lived with her off and on for most of his life and that she was very close to him. Her home was three houses away from the scene of the shooting and she heard the gunfire while she was in the backyard hanging up laundry. Although she was grateful that the responding officer was performing CPR on Ricky, she knew when she saw him lying on the sidewalk that he was gone. She further testified that little things around the house brought back memories of Ricky every day, as did the presence of Ricky's young son, Harry Byrd V, who was born shortly after Ricky's death. She also informed the jury that on the day of the shooting, Ricky had applied for a job at UPS, and that he aspired to go to college to become a marine biologist.

### ii. Fred Malouf's murder

Fred's wife Donna testified that she has been in weekly counseling to deal with her grief and anger. She also told the jury that she had since remarried, but that "Fred was, and always will be, my life."

Fred's nephew testified about their close relationship and the profound influence his uncle had on him, especially on his decision to choose a career in law enforcement. He also told the jury that his uncle had a great sense of humor and that during his retirement he "enjoyed life to the fullest" by hunting, fishing, prospecting, and spending time with the family. He also organized annual family reunions so that the family could get together for an event other than a funeral.

### 2. Defense case in mitigation

The defense had intended to present the testimony of three inmates who witnessed the May 1997 altercation between defendant and sheriff's deputies in the West Valley Detention Center. Because calling the witnesses would have required a continuance of three to four weeks, however, over the prosecutor's

18

objection, the court permitted the defense to introduce the inmates' taped statements in lieu of their testimony.

The inmates' recorded statements were played for the jury, who followed along with a written transcript. Casey Whigman stated that "all hell broke loose" when Deputy Llewelyn pushed defendant for not "locking it down" as quickly as he wanted him to. According to Linnard Roberson, the officers rushed defendant as he was on his way to his cell, and never asked him to stop. Defendant was fighting, but he was defending himself, and the officers continued to beat him and "stomp[] his head into the pavement" even after he had been subdued. Jack Dunnigan observed that before punches were thrown, one of the officers got "right up close in [defendant's] face" and pushed him. He likewise saw the officers slam defendant's head into the concrete and stomp on him after he was handcuffed.

The defense also presented testimony by David Call, the attorney who previously had represented defendant in the case. Call explained to the jury that he had planned to present mitigating evidence regarding defendant's upbringing, but defendant refused to allow him to do so, saying he "would rather die than have his mother be disgraced in the courtroom."[8]

## II. DISCUSSION

### A. Pretrial Issues

#### 1. *Denial of motion to sever the two murder counts*

Defendant asserts that the trial court abused its discretion and deprived him of his right to a fair trial and other federal and state constitutional guarantees by denying his motion to sever trial on the Ricky Byrd murder charge from trial on

---

[8] Neither party raises an issue regarding the admissibility of defendant's mitigating evidence. We include these facts in the interest of completeness, and not as an endorsement of the trial court's rulings.

19

the charges relating to the homicide and robberies at the Pepper Steak Restaurant.[9]

His claim fails, as we explain, *post*.

### a. Background

Defendant and Rogers each were charged with the murder of Fred Malouf and other crimes related to the incident at the Pepper Steak Restaurant. Defendant also was charged with the murder of Ricky Byrd, a separate crime occurring nine days earlier that did not involve Rogers. In November 1997, the court held a hearing on the prosecutor's motion to join defendant's and Rogers's cases for trial. The court granted the motion over the objection of Rogers's counsel, noting that the guilt phase would focus predominantly on the restaurant homicide and robberies and rejecting the argument that evidence regarding the Ricky Byrd murder charge would prejudice Rogers. The court then considered defendant's

---

[9] Defendant contends that the court's rulings violated his rights to due process, a fair trial, jury trial, a reliable determination of guilt and penalty, and fundamental fairness as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their counterparts in the California Constitution. He invokes the same constitutional provisions in almost every other claim raised in this appeal. "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) " 'No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here.' [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 811, fn. 8.)

motion to sever trial on the Ricky Byrd murder charge from trial on the counts arising from the restaurant incident. In denying that motion, the court observed that all of the charges involved crimes of the same class and were committed relatively close in time.

Defendant later sought reconsideration of the court's ruling denying severance. At the hearing on that motion, the court also considered defense counsel's alternative proposal to try defendant and Rogers before a single jury on the charges relating to the restaurant incident first and then, after the jury reached its verdicts on those counts, try defendant alone on the Ricky Byrd murder charge before the same jury and proceed to a penalty phase if necessary. The court again denied the motion to sever counts, reiterating its prior observation that the charges arising from the separate incidents were the same class of crimes and finding that joinder would not create undue prejudice. However, it granted the alternative request to bifurcate the guilt trial, concluding that the procedure proposed by defendant's counsel would not only prevent the potential for prejudice to defendant and Rogers, but also avoid the inefficiency of conducting separate trials. At a subsequent hearing, the court explained more specifically that the bifurcated guilt phase proceedings would alleviate the problem of the jury's hearing both murder charges at the same time and using each of them "to kind of supplement the other count."

Defendant renewed his motion to sever counts after the jury had rendered its guilty verdicts in the restaurant robbery-murder case, arguing that it was "fundamentally unfair" to have the same jury now hear the Ricky Byrd murder charge. The court found no prejudice to defendant and no reason to depart from its earlier ruling. As the court observed, the bifurcated procedure benefited defendant because the jury heard evidence and decided the potentially weaker of

21

the two cases first without having heard the evidence relating to the other shooting incident.

### b. *Defendant fails to show prejudice from joinder*

Defendant does not dispute that the restaurant murder and robbery charges and the Ricky Byrd murder charge were properly joined under section 954, which permits the joinder of "two or more different offenses of the same class of crimes or offenses." (See also *People v. Soper* (2009) 45 Cal.4th 759, 771 (*Soper*).) The law favors the joinder of counts because such a course of action promotes efficiency. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.) A trial court has discretion to order that properly joined charges be tried separately (§ 954), but there must be a "clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion." (*People v. Mendoza* (2000) 24 Cal.4th 130, 160.) In assessing a claimed abuse of discretion, we assess the trial court's ruling by considering the record then before the court. (*Soper, supra*, at p. 774; *People v. Avila* (2006) 38 Cal.4th 491, 575.)

If the evidence underlying each of the joined charges would have been cross-admissible under Evidence Code section 1101[10] had they been prosecuted in separate trials, "that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Soper, supra*, 45 Cal.4th at p. 775; see also *People v. Vines* (2011) 51 Cal.4th

---

**10** Evidence Code section 1101, subdivision (b) states, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

830, 855.)  We doubt, however, that the evidence regarding these two separate incidents was sufficiently similar to support an inference of intent, motive, or any other fact in issue that would render the evidence cross-admissible, and respondent does not argue otherwise.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.)  As defendant observes, the intent and motive behind the restaurant incident was robbery while the Ricky Byrd shooting may have been motivated by a drug debt or some sort of personal vendetta against "Smoke."

We need not affirmatively decide, however, whether the evidence would have been cross-admissible in separate trials because, as defendant acknowledges, lack of cross-admissibility is not dispositive of whether the court abused its discretion in denying severance.  (§ 954.1; *People v. Thomas* (2011) 52 Cal.4th 336, 350 ["When two crimes of the same class are joined, cross-admissibility is not required"].)  To resolve the question of abuse of discretion, we must further inquire "whether the benefits of joinder were sufficiently substantial to outweigh the possible 'spill-over' effect of the 'other-crimes' evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses."  (*People v. Bean* (1988) 46 Cal.3d 919, 938; see *People v. Thomas, supra*, 52 Cal.4th at p. 350.)  To make that determination "[w]e consider [1] whether some of the charges are likely to unusually inflame the jury against the defendant; [2] whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and [3] whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.'  [Citation.]"  (*People v. Thomas* (2012) 53 Cal.4th 771, 798-799.)  " 'We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.'  [Citation.]"  (*Ibid*.)

23

None of these considerations point to a potential for prejudice that outweighed the benefits of joint trial in this case. As previously noted, at defendant's request, the trial court ordered the guilt phase of trial bifurcated so that the jury heard evidence and reached its verdicts in the restaurant case before considering the evidence regarding the Ricky Byrd homicide. In the trial court's view, such a procedure both prevented the potential for prejudice and avoided the inefficiency of conducting separate trials. We agree. As the court observed in denying defendant's final severance motion before commencement of the Ricky Byrd homicide case, the jury heard evidence and decided the potentially weaker of the two cases without exposure to the evidence relating to the stronger murder charge. As a result of this procedure, the risk of potential prejudice from joinder was small and it certainly was outweighed by the benefits of trial on all counts before a single jury.

Defendant argues nonetheless that the evidence relating to the restaurant crimes was likely to inflame the jurors against him because the homicide victim in that case was a retired police officer who was killed while attempting to protect his wife. We have recognized some potential for prejudice when the murder victims are police officers killed in the line of duty. (See *Odle v. Superior Court* (1982) 32 Cal.3d 932, 942 ["[c]ommunities undoubtedly have special hostility toward 'cop killers' "].) The same concerns are not implicated here, however. Moreover, we observe that the callous, cold-blooded killing of Ricky Byrd, who was shot down in front of his friends after innocently responding to defendant's request to "give Smoke a message," was no less inflammatory than the events that unfolded at the restaurant. Any potential for prejudice from evidence regarding the restaurant murder was lessened, furthermore, because the evidence of defendant's guilt of the Ricky Byrd murder was strong.

24

Noting that the Ricky Byrd homicide case, standing alone, did not involve a special circumstance, defendant asserts further that the court's refusal to sever counts converted that matter into a capital case. There is no potential for prejudice under this factor, however. As we recently explained in *People v. Thomas*, *supra*, 53 Cal.4th at pp. 799-800, "[o]ur concern in such situations is whether joinder 'would tend to produce a conviction when one might not be obtainable on the evidence at separate trials. Clearly, joinder should never be a vehicle for bolstering either one or two weak cases against one defendant, particularly where conviction in both will give rise to a possible death sentence.' [Citation.]" In the present case, the evidence supporting each of the murder cases was not weak and neither case posed the risk of an unjustifiable conviction.

As defendant correctly points out, even when a trial court's denial of severance was not an abuse of discretion at the time it was made, we must reverse the judgment on a showing that joinder actually resulted in " ' "gross unfairness" ' " amounting to a denial of fair trial or due process. (*People v. Mendoza, supra,* 24 Cal.4th at p. 162.) However, he fails to make such a showing here. Contrary to defendant's assertion, the restaurant homicide and robberies were no more "emotionally charged" and "inflammatory" than the Ricky Byrd murder charge, as previously discussed. Nor does defendant explain why the trial court's instruction to jurors to decide the Ricky Byrd homicide case "separately and independently" from the counts at the earlier phase was insufficient to prevent a grossly unfair trial. Given the bifurcation of trial of the two separate incidents, there was minimal risk, even absent such an instruction, that the jury would have considered the restaurant crimes as evidence supporting conviction in the Ricky Byrd case. (See *People v. Mendoza, supra*, at p. 163 [rejecting the defendant's argument that the trial court had a sua sponte duty to instruct the jury not to consider evidence of one of the joined crimes as evidence of another offense].)

25

Defendant's claim that the denial of severance rendered his trial grossly unfair does not succeed.

### 2. *Denial of defense motion for a "ski mask" lineup*

Prior to the start of trial, the defense moved for a live lineup at which the participants would wear ski masks to partially obscure their faces. Defendant claims that the trial court's denial of that motion was an abuse of discretion and a violation of his right to due process and other constitutional protections. We conclude there was no error.

The record shows the following. At a live lineup conducted on April 30, 1996, 10 days after the restaurant crimes, four eyewitnesses to those crimes identified defendant as the perpetrator who was wearing a ski mask. Four years later, the defense moved that the court order a live lineup at which the participants would wear ski masks. At a hearing on the motion, defense counsel argued that, as a matter of fundamental fairness, the eyewitnesses who identified defendant at the earlier lineup ought to be provided the opportunity to identify him while he was wearing a ski mask, which is how they described the perpetrator. The court observed that it was incumbent on investigators to conduct the *initial* live lineup, which had occurred shortly after the shooting. The court also noted that at that lineup, investigators adopted defense counsel's suggestion to have the participants wear a black knit cap pulled down to the forehead, covering their hair and ears. In the court's view, the initial lineup amply protected defendant's due process rights and a second lineup was not required. As the court pointed out, whether or not an eyewitness could pick out defendant in a ski mask four years after the incident would neither bolster nor cast doubt on his or her original identification.

*Evans v. Superior Court* (1974) 11 Cal.3d 617, 625 (*Evans*), held that the due process clause requires the trial court, in an appropriate case, to grant a

26

defendant's timely request for a pretrial lineup. The right to a lineup is not absolute, however. Rather, it arises "only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (*Ibid*.) The decision whether to order a pretrial lineup rests within the sound discretion of the trial court. (*Ibid*.; see also *People v. Williams* (1997) 16 Cal.4th 153, 235-236.)

Here, less than two weeks after the incident, eyewitnesses to the restaurant crimes viewed a live lineup. To account for the fact that there was no opportunity for the eyewitnesses to observe the robber's hairstyle, and at counsel's behest, all of the lineup participants donned black watch caps that were pulled down to cover their hair, foreheads, and ears. Some of the eyewitnesses identified defendant. Others identified a different individual or made no identification at all. At trial, defense counsel cross-examined the eyewitnesses who had positively identified defendant at the live lineup, eliciting from them that the robber's face had been covered by the ski mask. On this record, we agree with the trial court that defendant received due process.

Defendant's real complaint appears to be that the initial lineup was suggestive and its results unreliable because, by presenting participants whose faces were not covered by ski masks, it failed to duplicate the conditions at the crime scene. We note that Donna testified she was able to see most of defendant's face when his mask slipped down below his nose. But even if it might have been proper for each of the lineup participants to wear a ski mask like the one worn by the perpetrator (*United States v. Hinton* (D.C. Cir. 1980) 631 F.2d 769, 774), there is no authority supporting the proposition that they were required to do so. Even assuming that the participants at the initial lineup should have worn ski masks rather than knit caps, it would not establish defendant's right to a second pretrial lineup. In considering the defendant's claim of a due process right to a pretrial

lineup in *Evans,* this court explained that the inquiry was not whether the receipt of identification evidence at trial is so unfair to the accused as to infringe due process but rather whether "the accused can insist that procedures be afforded whereby the weakness of the identification evidence, if it is in fact weak, can be disclosed." (*Evans, supra*, 11 Cal.3d at pp. 621-622.)  In this case, the original lineup adequately revealed to the defense the weakness of the eyewitnesses' identifications, and defense counsel vigorously challenged the evidence during cross-examination.  The court observed, and we agree, that a second lineup would do nothing to assist the defense in testing the reliability of the identifications.  The court did not abuse its discretion in denying defendant's request for a ski mask lineup.

### 3.  *Denial of the third request for substitution of counsel*

The trial court granted defendant's requests to replace his first two appointed counsel.  Ten months before the commencement of trial, when defendant sought to discharge his third attorney and substitute new counsel, the court denied the motion.  Defendant asserts that the trial court's refusal to grant his request for substitution of counsel constituted an abuse of discretion.  As we shall explain, the court's ruling was neither an abuse of discretion nor did it violate defendant's Sixth Amendment right to the effective assistance of counsel.

### a.  *Background*

In February 2000, the trial court conducted a pretrial hearing on various motions.  Defendant addressed the court directly with regard to one motion, requesting an order for access to the law library.  Defendant explained that he needed library access in order to fully understand the proceedings and determine which motions he had a right to file.  He complained that his defense attorney,

Chuck Nacsin, had failed to properly advise him, advocate for him, and protect his rights.

The trial court denied defendant's request for law library privileges on the ground that it was counsel's role to present motions on defendant's behalf. The court added that Nacsin was one of the most experienced criminal defense attorneys in the county, and, in the court's view, always had demonstrated the highest degree of professionalism and competence. The court also found, however, that defendant's expression of dissatisfaction with Nacsin suggested that he might be requesting substitution of counsel. The court excused the prosecutor from the courtroom so that it could conduct a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.

At the hearing, defendant read into the record a written statement entitled "Request for a *Marsden* Hearing," which set forth numerous accusations against Nacsin. Specifically, he claimed that counsel was attempting to "railroad" him by refusing to provide discovery. He also complained that counsel refused to interview the witnesses he had suggested and was not properly investigating issues that defendant brought to his attention. For instance, defendant faulted counsel for failing to follow up on evidence indicating that a defense investigator and detectives from the Colton Police Department had sabotaged the investigation because they knew the victim Fred Malouf and evidence that investigative officers were threatening the witnesses. Defendant also complained that counsel refused to file a motion for the release of police officer personnel files or to seek recusal of the court and the prosecutor on the ground that they likewise knew Fred Malouf. Defendant repeated his earlier allegations that Nacsin was not properly advising him regarding his rights or working in his best interests. He also reiterated that he had no trust or faith in counsel and accused him of conspiring with the police and prosecutors to secure his conviction. Defendant complained finally that Nacsin

29

visited him only once every two to three months and that Nacsin's law office refused to accept his collect calls.

When defendant had finished reading his written statement, he indicated to the court that he was not actually making a *Marsden* motion at that time but rather seeking discovery, which he would review, and then would present his *Marsden* motion at a subsequent hearing. Counsel objected to defendant's having access to discovery materials while in jail because of the risk that they would fall into the hands of jailhouse informants. The court, however, directed counsel to provide defendant with all discovery and the transcripts of all proceedings that had occurred since his appointment as counsel of record.

The hearing on defendant's eventual *Marsden* motion occurred four months later in June 2000. Defendant repeated his earlier complaints that counsel was ignoring his requests to explore whether investigative officers were threatening the witnesses and falsifying evidence. When the court asked Nacsin whether he had discussed those subjects with defendant, he replied that he had done so "many times." Nacsin also indicated that he was pursuing everything he could pursue in the case. Defendant responded that he did not know what counsel was doing. He also asserted that when he and counsel discuss the case, they "collide" and he cannot understand him. As defendant further explained, "I got to be able to trust him, for us to have that attorney-client relationship. And I don't trust him because I don't know . . . what he's doing."

The court found no basis for ordering substitution of counsel at that time and denied the *Marsden* motion without prejudice. In the court's view, defendant's appointed counsel was "one of the more tenacious defense attorneys" to appear in his courtroom over the past 20 years, and the court was certain that if there was evidence suggesting that a witness had been threatened, counsel would vigorously pursue that point during cross-examination. Defendant continued to express

30

frustration with attorney-client communications, saying that when he would ask counsel certain things about the proceedings, he would come away even more confused.  He also disclosed, however, that he wanted an opportunity to see if he and counsel could "come to some type of understanding" and "somehow see eye-to-eye" before deciding to go through with his request for a new attorney.  Although the court invited defendant to renew his *Marsden* motion after he had an opportunity to review additional discovery, defendant did not renew the motion.

### b.  Discussion

Defendant contends that the court's denial of his request for substitution of counsel was an abuse of discretion because the complaints summarized, *ante*, were emblematic of a difficult, unproductive relationship between him and his counsel, which led to an irretrievable breakdown in their ability to work together that substantially impaired his constitutional right to the effective assistance of counsel.  We disagree, as explained, *post*.

Established principles govern our assessment of whether the court abused its discretion in denying defendant's *Marsden* motion.  "Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge.  The court does not abuse its discretion in denying a *Marsden* motion ' "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." '  [Citations.]  Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].'  [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 912.)

31

Contrary to defendant's contention, none of his various complaints concerning counsel suggests an irreconcilable conflict between them. Defendant's main grievance was that counsel refused to pursue his suggested motions and lines of investigation. However, " '[t]actical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict." ' " (*People v. Roldan* (2005) 35 Cal.4th 646, 682; accord, *People v. Cole* (2004) 33 Cal.4th 1158, 1192.) Although defendant complained that he did not know what counsel was doing, counsel informed the court that he and defendant had discussed defendant's suggestions "many times," and that he was pursuing everything he could. The court was entitled to credit counsel's representations in this regard. (*People v. Clark, supra*, 52 Cal.4th at p. 912; *People v. Smith* (1993) 6 Cal.4th 684, 696.) Nor was an irreconcilable conflict shown by defendant's assertions that he did not trust his attorney and "collided" with him when they discussed the case. As we explained in *People v. Jones* (2003) 29 Cal.4th 1229, "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." (*Id.* at p. 1246; see also *People v. Abilez* (2007) 41 Cal.4th 472, 489.) Furthermore, "[a] trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel . . . ." (*People v. Crandell* (1988) 46 Cal.3d 833, 860.) Here, after defendant indicated his willingness to try to "come to some type of understanding" with counsel, the court reasonably could find that any asserted conflict between defendant and his attorney was not irreconcilable. That conclusion was borne out by the fact that although the court's denial of the request for substitution of counsel was without prejudice, defendant

did not renew his *Marsden* motion.  As for defendant's complaint that counsel rarely visited him, such an allegation does not justify substitution of counsel. (*People v. Hart* (1999) 20 Cal.4th 546, 604.)  We conclude that the trial court did not abuse its discretion in denying the *Marsden* motion.

### 4. *Disclosure of police officer personnel records*

Defendant filed a pretrial motion for an order directing the prosecution to provide the confidential personnel records of 10 law enforcement officers involved in the investigation of the crimes and his postarrest confinement in county jail.  He argued that the prosecutor was obligated to disclose the identified records because they amounted to favorable, material evidence within the meaning of *Brady v. Maryland* (1963) 373 U.S. 83.  At a hearing on the motion, the court indicated that, in an abundance of caution, it found good cause to conduct an in camera review of the personnel records in issue to determine whether any of them showed complaints or disciplinary action involving improper conduct such as falsifying evidence or testifying falsely, or any other potential impeachment material that should be disclosed to the defense.  (See Evid. Code, § 1043, subd. (b); *Pitchess v. Superior Court* (1974) 11 Cal.3d 531; see generally *People v. Gaines* (2009) 46 Cal.4th 172, 179 [summarizing the state law procedures by which a defendant may seek disclosure of police personnel records].)  The court conducted separate in camera hearings to review the files provided by the three different law enforcement agencies involved.  Neither defendant nor the prosecutor attended the hearings.

The court ordered that the reporter's transcripts of each of the three hearings be sealed, but it announced its rulings in open court.  Specifically, the court indicated that it denied disclosure of the records of San Bernardino Police Officers Voss and Filson and Colton Police Officers Morenberg, Owens, and Schiller,

33

finding nothing in their personnel files that was likely to lead to any admissible impeachment evidence. The court ordered that defense counsel be provided access to reports and handwritten notes by two San Bernardino Sheriff's deputies who claimed they were injured in the incident involving defendant at the jail, but it denied disclosure of the remaining files.

The transcripts of the in camera hearings that the court ordered sealed have remained under seal. Noting that neither the transcripts nor the documents reviewed by the trial court were made available to him or his appellate counsel, defendant requests that this court conduct an independent review of these materials. He asserts that such review is necessary to ensure that the trial court's rulings did not infringe his right to due process. Respondent does not oppose the request.

"This court routinely independently examines the sealed records of such in camera hearings to determine whether the trial court abused its discretion in denying a defendant's motion for disclosure of police personnel records. [Citations.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1285; accord, *People v. Chatman* (2006) 38 Cal.4th 344, 398.) We have done so in this case.

The sealed record at issue here includes a full transcript of the three in camera hearings, but not the actual personnel files that formed the basis of the trial court's ruling barring disclosure of most of the requested materials. As defendant points out, the trial court refused appellate counsel's suggestion to include in the record on appeal the actual documents that it had reviewed during the in camera hearings. We agree with the trial court's ruling that the transcript of the hearings was sufficient. The sealed transcript that is before us, in which the court "state[d] for the record what documents it examined," is adequate for purposes of conducting a meaningful appellate review. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.)

Having independently reviewed the sealed records, we conclude that the trial court's ruling refusing to disclose the requested personnel files except for the portions relevant to the May 1997 jail incident that involved defendant was neither an abuse of discretion nor a violation of defendant's due process rights. (*Pitchess v. Superior Court, supra*, 11 Cal.3d at p. 535; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

## B. Guilt Phase Issues

### 1. *Evidence of witness dissuasion*

Defendant claims that reversal is required because he was prejudiced by the admission of evidence that a prosecution witness at trial of the restaurant crimes had received a telephone call "from someone" that may have made her afraid to testify. Although defendant is correct that the evidence could not be used by the jury to infer his consciousness of guilt, there was a proper, albeit limited, purpose for introducing the evidence and there is no merit to defendant's assertion that he was incurably prejudiced by its admission, as we explain, *post*.

### a. *Background*

Prosecution witness Karen King testified that for a two-week period in February 1996, prior to the restaurant crimes, defendant stayed with her and her boyfriend in the same Highland apartment complex where codefendant Rogers resided. She told the jury that she recalled seeing a handgun in the apartment at the time, although she could not confirm that it belonged to defendant. During direct examination, the prosecutor asked the witness whether she was afraid to be in court. She answered, "No." The prosecutor then followed up by asking, "Did you receive a phone call from someone?" The court sustained defense counsel's hearsay and discovery objections. The prosecutor continued to question the witness, eliciting from her that although she was initially fearful of testifying, she

was no longer afraid. At defense counsel's request, the court then conducted a sidebar conference to discuss the objected-to evidence.

Outside the jury's presence, the prosecutor explained that the brother of King's boyfriend had called to tell her "that it would be better for her if she did not come to court and if she did not testify." The court agreed with defense counsel that the prosecutor should have disclosed this information to the defense before the witness's testimony. When defendant's counsel further complained that the prosecutor's line of questioning implied that defendant made a threatening telephone call, the court suggested that defense counsel attempt to elicit from the witness during cross-examination that the call was not from defendant or codefendant Rogers. The court also indicated that, on request, it would instruct the jury with CALJIC Nos. 2.05 and 2.06, regarding the requirements for considering the suppression of evidence as tending to show a consciousness of guilt. Defense counsel moved for mistrial, arguing that the admission of the telephone call evidence denied defendant his federal constitutional guarantees, including his rights to due process and to cross-examine the witnesses against him. The court denied the motion, finding that any prejudice would be diffused by cross-examination and a cautionary instruction expressly directing the jury not to infer defendant's guilt from evidence of an effort to suppress evidence. The prosecutor added that he attempted to present the telephone call evidence solely for purposes of testing the witness's credibility.

Defense counsel introduced the telephone call evidence during cross-examination, and elicited from King that neither defendant nor Rogers had called her or had asked someone to call her. In response to defense counsel's question whether she had been threatened, she replied, "Not threaten. Just told me it would be best if I didn't testify." King also indicated that she was as reluctant to be on

36

the witness stand as she had been to speak with investigating officers five years earlier.

Immediately following King's testimony on this point, the court instructed the jurors that "the phone call was not made" by either defendant or the codefendant, and informed them that "unless there was evidence to indicate they told someone to do that, which at this point there is not, it cannot be considered against either [of them]." The court also explained to the jury, however, that the telephone call evidence could be considered in evaluating the credibility of the witness.

The court instructed on the issue again before closing arguments, this time affirmatively directing the jury not to consider evidence of an attempt to suppress evidence "as tending to show any consciousness of guilt on the defendant's part."

### b. Discussion

We agree with the trial court that there was a proper, albeit limited, purpose for the introduction of the evidence that someone called King attempting to dissuade her from testifying, which was its effect on King's credibility as a witness. The fact that King came to court and took the witness stand notwithstanding the caller's advice tended to bolster her credibility. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1142 [evidence that the defendant's sister offered the witness money to refrain from testifying was relevant to evaluating the witness's credibility]; cf. *People v. Burgener* (2003) 29 Cal.4th 833, 870 ["[i]t is not necessarily the source of the threat — but its existence — that is relevant to the witness's credibility"].)

Defendant argues that King's testimony was incurably prejudicial, and deprived him of a fundamentally fair trial, because the very fact the threatening call was made raised the inference that he had authorized it. His contention is

37

unpersuasive. As the record reflects, defense counsel affirmatively elicited from King that the caller did not threaten her or state that he was speaking on defendant's behalf, and the court instructed the jury that the telephone call evidence could not be considered against either him or his codefendant. Under these circumstances, "[w]e think it highly unlikely the jurors understood they could infer defendant authorized or orchestrated [a] threat . . . ." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670 [relying on similar grounds to reject the argument that evidence regarding the defendant's sister's attack on a prosecution witness posed a danger that the jury would speculate that the defendant authorized it].) Defendant suggests that the trial court "left the door open" for the jury to infer that he was responsible for the threatening call when it instructed subsequent to King's testimony that "at this point" there was no evidence connecting defendant to the call. The record shows, however, that at the close of evidence the trial court made clear to the jurors that they were not permitted to consider the telephone call evidence as tending to show defendant's consciousness of guilt. We presume jurors "generally understand and follow instructions." (*People v. McKinnon, supra*, at p. 670.)

Defendant complains nonetheless that the court's instruction directing the jurors not to consider against him the evidence of the telephone call to King did nothing to dispel the inference of consciousness of guilt. He urges this court to adopt the reasoning and result of a 1974 decision by the Indiana intermediate appellate court, which concluded that a new trial should have been granted in that case because testimony by a prosecution witness about having received threats and bribes was "so prejudicial to [the] defendant that no jury could be expected to apply it solely to the question of the credibility of the witness." (*Keyser v. State* (Ind.Ct.App. 1974) 312 N.E.2d 922, 924.) Even were we to agree with the *Keyser* decision that the prejudice to the defendant in that matter could not be cured by an

38

instruction to disregard the improper evidence, the case is readily distinguishable from the present one in important respects. In *Keyser*, the prosecution's entire case depended on the testimony of the witness who had been threatened. (*Id*. at p. 924.) Here, by contrast, King's testimony played but a minor role in establishing defendant's guilt of the restaurant crimes; at best, her testimony showed only that two months before the crimes defendant was associating with codefendant Rogers and carrying a firearm. In *Keyser,* furthermore, the reviewing court intimated that the prosecutor's introduction of the improper testimony was calculated to prejudice the defendant. (*Ibid*.) The telephone call evidence at issue here, however, was admissible for the proper, limited purpose of assessing the witness's credibility. Finally, in *Keyser* there was no evidence or instruction advising the jury that the defendant was not involved in the attempted bribe and threat. In this case, the court expressly instructed the jury that defendant had no connection to the telephone call King received. Given the slight significance of King's testimony and the absence of any evidence from which the jury could infer that the telephone call was made at defendant's behest, we reject defendant's assertion that the court's instructions were insufficient to overcome the assertedly prejudicial effect of King's testimony on this point. The court did not abuse its discretion in denying defendant's motion for mistrial, and its ruling allowing the testimony for a limited purpose did not render defendant's trial fundamentally unfair.

### 2. *Courtroom presence of the restaurant murder victim's wife*

Defendant claims that the court abused its discretion and deprived him of his various constitutional rights when it allowed Donna, the restaurant murder victim's wife, to remain in the courtroom after testifying for the prosecution. There was no error.

39

### a. Background

Prior to jury selection in the case, the court conducted a brief hearing on a defense motion to exclude witnesses during the course of trial, and the court agreed that witnesses should not hear the testimony of other witnesses prior to testifying. The discussion, however, focused primarily on whether Donna Malouf Lawrence, the homicide victim's wife and a percipient witness to the incident at the restaurant, would be permitted to remain in the courtroom following her testimony. After being informed that the prosecutor had advised Donna regarding appropriate courtroom demeanor, the court indicated that it would exercise its discretion to exclude from the courtroom *any* witness or spectator whose conduct would prevent either side from receiving a fair trial. Nonetheless, defense counsel expressed his concern that Donna's presence during the guilt phase would affect the fairness of the possible penalty phase, at which Donna would be called to the witness stand to give victim impact testimony. The court pointed out, however, that the same concern was present in any death penalty case in which victim impact witnesses were present during the guilt phase. In the court's view, once Donna had testified, the rationale for excluding her from the courtroom no longer existed. Although the court ruled that it would allow Donna to remain in the courtroom following her testimony, it reiterated that if it came to the court's attention that anyone in the courtroom engaged in inappropriate conduct, it would not hesitate to exclude such person from the proceedings.

Without defense objection, Donna testified at the guilt phase of trial with the assistance of a victim-witness advocate. At the prosecutor's request, the court instructed the jury regarding the support person's presence and role.[11]

---

[11] The court instructed, "Ladies and gentlemen, the law provides that an alleged victim in a crime is allowed to have a support person with them in court

*(footnote continued on next page)*

40

Consistent with the court's earlier ruling, Donna remained in the courtroom after completing her testimony, sitting in the front row. When the next prosecution witness had answered several questions on direct examination, defense counsel complained to the court outside the jury's presence that Donna had been nodding her head in agreement with the witness's answers. The court indicated that it had not observed Donna nodding her head, but suggested that she be told to be more mindful of her gestures. The prosecutor informed the court that he had done so. Although the court overruled defense counsel's objection to Donna's presence, it stated it would monitor the situation and, if a problem arose, it would recommend that Donna sit in the back of the courtroom.

Defense counsel renewed the objection to Donna's presence during the testimony of a prosecution witness who was describing the shooting of the victim, Fred Malouf. As counsel pointed out, Donna was crying and being held by her support people, and he saw one of the jurors looking over at her and staring. The court noted that it had been paying attention to Donna and agreed that she appeared upset. It observed, however, that she was not making any disturbance. In the court's view, her conduct was no different from that in any other case in which family members of the victim exhibit some type of emotional reaction, and she had a right to be in the courtroom.

### b. Discussion

Defendant argues that the presence of a support person to assist Donna during her guilt phase testimony, coupled with Donna's nodding her head in

---

*(footnote continued from previous page)*

during testimony. The support person is entitled to sit with them but is, obviously, not the witness and is not going to participate in any manner."

41

agreement with prosecution testimony and "emotional outbursts" during trial, interfered with the jury's ability to deliberate and reach an unbiased verdict in violation of his right to a fair trial, an impartial jury, and other constitutional guarantees. Because defendant did not object when a victim-witness advocate accompanied Donna to the witness stand, he has forfeited that portion of his claim. (*People v. Stevens* (2009) 47 Cal.4th 625, 641.) We find no merit to his contention in any event.

Defendant insists that he was prejudiced by the support person's presence on the witness stand while Donna testified because it created a false and distorted view of Donna's demeanor and tacitly vouched for the truth of her testimony. We are not persuaded. Section 868.5 permits prosecution witnesses in cases involving murder and other enumerated offenses to be attended in court by two support persons, one of whom may accompany the witness to the stand. Absent improper interference by the support person, however, no decision supports the proposition that defendant advances here, that the support person's mere presence infringes his due process and confrontation clause rights. " 'The presence of a second person at the stand does not require the jury to infer that the support person believes and endorses the witness's testimony, so it does not *necessarily* bolster the witness's testimony.' [Citation.]" (*People v. Stevens, supra*, 47 Cal.4th at p. 641; see *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1076-1079; *People v. Patten* (1992) 9 Cal.App.4th 1718, 1725-1733.) Here, the record does not disclose any circumstances indicating that Donna's support person improperly influenced the jury's assessment of her testimony. (See *People v. Patten, supra*, at pp. 1731-1732.) For instance, there is no description as to where the support person sat in proximity to Donna and whether she had physical contact with Donna during her testimony. Nor is there any indication that the support person displayed emotion or gestures suggesting to the jury that she believed Donna's account of the

42

incident. (*Patten, supra*, at pp. 1732-1733.) Notably, the court informed the jurors that Donna was entitled by law to be attended by a support person during her testimony, and admonished them that the support person was "not the witness." This admonition, coupled with the court's instruction directing the jury to base its decision in the case solely on the evidence received at trial and not to be swayed by sympathy or prejudice, further undermines any suggestion of improper interference by the support person. (*People v. Ybarra, supra*, at p. 1078.) Defendant fails to show that he was prejudiced by the presence of a support person during Donna's testimony.

Nor are we persuaded by defendant's argument that he was prejudiced further by Donna's nodding in agreement with prosecution witnesses and crying in court while being comforted by support persons. Defendant posits that such conduct would have instilled in the jury powerful feelings of sympathy and revenge, leading to verdicts on guilt and penalty that were based, not on the evidence adduced at trial, but on emotion. His claim of prejudice is unsupported by the record.

A spectator's conduct is grounds for reversal if it is "of such a character as to prejudice the defendant or influence the verdict." (*People v. Lucero* (1988) 44 Cal.3d 1006, 1022; accord, *People v. Chatman, supra,* 38 Cal.4th at p. 369; see also *Holbrook v. Flynn* (1986) 475 U.S. 560, 572 [spectator conduct violates the federal Constitution if it is "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial"].) The trial court has broad discretion to ascertain whether a spectator's actions were prejudicial. (*People v. Chatman, supra*, at p. 369.)

There is no showing that Donna's presence in the courtroom following her testimony prejudiced defendant. During the hearing on Donna's continued courtroom presence, the court made clear its intention to exercise its discretion to

exclude any spectator whose conduct threatened the fair trial rights of either side. When later informed by defense counsel that he had seen Donna nodding her head in agreement with a prosecution witness, the court indicated that it would monitor her demeanor. After defense counsel subsequently complained that one or more jurors were watching Donna being comforted by support persons during another witness's description of the shooting, the court stated that it had observed no impropriety. The court acknowledged that Donna was upset but noted that she was not making a disturbance. On this record, the court properly exercised its discretion in overruling defense counsel's repeated objections to Donna's presence in the courtroom. Having observed the courtroom proceedings firsthand, the trial judge was in the best position to evaluate the impact of Donna's conduct in front of the jury. (*People v. Cornwell* (2005) 37 Cal.4th 50, 87.)

Defendant cites a number of out-of-state decisions reversing the judgments for spectator misconduct in support of his argument that the same result is warranted here. We examined these identical cases in *People v. Lucero, supra*, 44 Cal.3d 1006. In rejecting the defendant's invitation to adopt the reasoning and result from those decisions, we concluded that none involved the "single isolated outburst" at issue there. (*Id*. at p. 1023.) We easily reach the same conclusion in this case, in which the conduct in question is even farther afield from the unrelenting, prejudicial disruptions at issue in the cited cases.

### 3. Circumstantial evidence instructions

Defendant contends he was denied due process because the court's instructions explaining to the jury how to consider circumstantial evidence were contrary to the requirement of proof beyond a reasonable doubt. We disagree.

The court instructed at the two guilt phases with CALJIC Nos. 2.01 and 8.83: the sufficiency of circumstantial evidence to prove guilt and the special

circumstance allegations, respectively. In relevant part, both instructions informed the jury that if one interpretation of the circumstantial evidence "appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

Defendant faults the instructions in two respects. First, he argues that telling the jurors they must accept a guilt interpretation of the evidence "that appears to be reasonable" allows a finding of guilt based on proof less than beyond a reasonable doubt. (*Cage v. Louisiana* (1990) 498 U.S. 39.) We have repeatedly rejected the identical contention. "When the questioned phrase is read in context, not only with the remaining language within each instruction but also together with related instructions, including the reasonable doubt instruction, it is clear that the jury was required only to reject unreasonable interpretations of the evidence and to accept a reasonable interpretation that was consistent with the evidence." (*People v. Crittenden* (1994) 9 Cal.4th 83, 144; accord, *People v. Brasure* (2008) 42 Cal.4th 1037, 1058; *People v. Romero* (2008) 44 Cal.4th 386, 415.) Defendant acknowledges our prior decisions and urges us to reconsider them. He offers no persuasive reason to do so.

Defendant further criticizes CALJIC Nos. 2.01 and 8.83 for *requiring* the jury to draw an incriminatory inference when such an inference merely appears to be reasonable. Specifically, he argues that imposing on the jurors a duty to accept an interpretation of evidence pointing to his guilt creates an impermissible mandatory, conclusive presumption. (*Carella v. California* (1989) 491 U.S. 263, 265-266.) We repeatedly have rejected the same contention. (*People v. Crittenden, supra,* 9 Cal.4th at p. 144; *People v. Wilson* (1992) 3 Cal.4th 926, 942-943.) We do so again here for the reasons stated in those decisions.

*4. Failure to instruct on voluntary intoxication*

Defendant contends he was denied his state and federal rights to due process, fair trial, and a reliable determination of guilt and penalty by the absence of instructions explaining to the jury how voluntary intoxication may have affected his ability to form the specific intent necessary for conviction of the restaurant crimes. Defendant acknowledges that, absent a defense request, the trial court had no duty to instruct on voluntary intoxication. (*People v. Verdugo* (2010) 50 Cal.4th 263, 295; *People v. Saille* (1991) 54 Cal.3d 1103, 1120.)

Even had defense counsel asked the court to give a voluntary intoxication instruction, however, none was required because there was no substantial evidence either that defendant was intoxicated or that intoxication affected his ability to "actually form[] a required specific intent." (§ 22, subd. (b); see *People v. Roldan, supra,* 35 Cal.4th at p. 715; accord, *People v. Williams, supra,* 16 Cal.4th at p. 677.) Lateshia Winkler testified that defendant was high when he returned to her apartment around 10:00 p.m., after the incident at the restaurant. She further explained on cross-examination that defendant was stumbling around and "shermed out," meaning that he was under the influence of PCP. During the same line of questioning, however, Winkler also indicated that defendant was "acting normal" before he left her apartment Saturday evening. Defendant points to no evidence suggesting that he was intoxicated at the time of the crimes.

## C. Penalty Phase and Sentencing Issues

*1. Effect of antisympathy "instruction"*

Defendant contends that his death sentence must be reversed because the court's instruction misled the jury regarding the scope of its discretion in determining penalty. We conclude that the jury was not misled.

The complained-of "instruction" was part of the court's introductory remarks to prospective jurors during voir dire. The court provided an overview of the

46

principles governing the guilt phase of the trial, such as the presumption of innocence and proof beyond a reasonable doubt. It also explained the rule that the jury determine the facts of the case based on the evidence received at trial, stating as follows: "It's a normal human reaction or a human emotion, you're going to be here *during the course of this trial through the various phases, we get to all of those phases*, for several weeks. . . . [Y]ou'll be seeing Mr. Rogers, Mr. Myles, every day," and their friends or family might be in the courtroom. Likewise, the court pointed out, there might be friends or family of the victims, and a "normal human reaction would be to have some feelings of sympathy" for them. The court indicated, however, that "what we're going to be asking you to do as jurors is to set aside any of those feelings of sympathy or empathy or compassion on either side and make an objective decision based solely on the facts and the law that I give you." (Italics added.)

Emphasizing the italicized portion of the court's remarks, defendant contends that the jury was impermissibly instructed not to consider sympathy during the penalty phase. Specifically, he complains that by referring to "the course of this trial through the various phases," and indicating that "we get to all of those phases," the court led the jury to believe that its "no sympathy" admonition was not limited to the determination of guilt. He argues that because the directive was given before the presentation of any evidence in the case, including his penalty phase witnesses, the jurors would have disregarded critical mitigating evidence, which he was constitutionally entitled to have them consider.

Having examined the record as a whole, including the court's instructions, we conclude that the jury was not misled into believing it could not consider sympathy when determining penalty. (See *People v. Frye* (1998) 18 Cal.4th 894, 1025; *People v. Howard* (1988) 44 Cal.3d 375, 433-434; *People v. Hernandez* (1988) 47 Cal.3d 315, 365-367.) At the penalty phase, before the presentation of

47

evidence, the court instructed the jury that it was "free to assign whatever moral or sympathetic value" it deemed appropriate to each of the statutory factors it was permitted to consider. Immediately after that, the court directed the jury to "disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with that principle." The court made the same point again at the conclusion of trial, prior to closing arguments, this time adding a directive to disregard "any statements that may have been made during jury selection, where we talked generally about some of the guidelines and principles." Even assuming for argument that at this juncture some jurors may have misunderstood the role of sympathy in their penalty determination, the court's further instruction left no doubt that it was a proper consideration. The court specifically informed the jury, "You were previously instructed at the guilt phase of the trial that sympathy or pity for the defendant should not influence your consideration of the evidence. In this, the penalty phase of trial, the jury may properly consider sympathy or pity for the defendant in determining whether to impose life in prison without the possibility of parole."

Defendant asserts that it is unreasonable to conclude that jurors could or would disregard the "no sympathy" instruction. We disagree. In the course of rejecting a claim similar to the one defendant raises here, we previously have concluded that statements made at the time of jury selection did not "create such an indelible impression" that jurors were unable to follow the court's subsequent, specific instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) The same conclusion is warranted here.[12] (See also *People v. Silva* (1988) 45 Cal.3d 604,

[12] Respondent argues that defendant has forfeited his claim of error because he did not object below. Defendant counters that the forfeiture rule does not apply when, as here, the court gives an instruction that incorrectly states the law.

*(footnote continued on next page)*

637 [jurors who were asked during voir dire whether they could set aside feelings of sympathy would not have remembered or been guided by that question two months later when making their penalty determination].)

### 2. *Victim impact evidence*

As previously described, two members of each murder victim's family testified about their respective loved one's character and the effect that his death had on them personally. Defendant claims that the victim impact evidence was outside the proper scope of aggravating evidence and unrelated to his moral culpability because there was nothing suggesting that he was aware of any aspect of the victims' lives. Defendant acknowledges that we have repeatedly rejected the argument that characteristics of the victim that are unknown to the defendant should not be presented to the jury for its consideration at the penalty phase. (See *People v. Nelson* (2011) 51 Cal.4th 198, 219, fn. 17; *People v. Pollock* (2004) 32 Cal.4th 1153, 1183.) He provides no persuasive reason for us to reconsider our prior pronouncements on this issue.[13]

---

*(footnote continued from previous page)*

(*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) We previously have not addressed whether a defendant is obligated to call to the trial judge's attention the type of alleged error being asserted here. (See, e.g., *People v. Howard, supra,* 44 Cal.3d at pp. 433-434 [rejecting the defendant's claim on the merits notwithstanding counsel's failure to object to the court's question to prospective jurors whether they would be willing to set aside sympathy].) We need not decide the forfeiture issue, however, because even if defendant's claim was preserved for appeal, it clearly lacks merit on this record. (*People v. Champion and Ross* (1995) 9 Cal.4th 879, 908, fn. 6.)

[13] For similar reasons, we reject defendant's further claim that the trial court erred by refusing defense counsel's request that the jury be instructed not to consider any victim impact evidence "unless it was foreseeably related to the personal characteristics of the victim that were known to the defendant at the time

*(footnote continued on next page)*

### 3. Imposition of upper-term firearm enhancement

In connection with each of the murder and robbery counts the jury found true the allegation that defendant personally used a handgun, within the meaning of section 12022.5, subdivision (a)(1). That provision allows for an additional sentence of 3, 4, or 10 years. The court imposed the upper term of 10 years for each murder conviction and for one of the two robbery convictions.

Defendant asserts that sentencing him with these upper term enhancements violated his Sixth Amendment jury trial right because none of the aggravating factors on which the court relied to impose them had been found true by the jury or admitted by him. (*Cunningham v. California* (2007) 549 U.S. 270; *People v. Sandoval* (2007) 41 Cal.4th 825.) We agree with defendant that the court erred when it selected the upper term enhancement on the Ricky Byrd murder count, relying on facts not found by the jury. However, the error was harmless beyond a reasonable doubt.

*Apprendi v. New Jersey* (2000) 530 U.S. 466 holds that, under the Sixth Amendment, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra,* at p. 490.) In *Blakely v. Washington* (2004) 542 U.S. 296, the high court extended the scope of *Apprendi* by defining "statutory maximum" as the "maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (*Blakely, supra,* at p. 303, italics omitted; see *In re Gomez* (2009) 45 Cal.4th 650, 656.) Applying *Blakely*, the court later held in *Cunningham v. California, supra,* 549

---

*(footnote continued from previous page)*

of the crime." Contrary to defendant's assertion, the trial court properly concluded that the proposed instruction was an incorrect statement of law.

50

U.S. 270, that California's determinate sentencing law did not comport with a defendant's Sixth Amendment jury trial right.  As *Cunningham* explained, "If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." (*Id*. at p. 290.)  Because the aggravating circumstances necessary for imposition of an upper term "depend on facts found discretely and solely by the judge" (*id*. at p. 288), the "statutory maximum" prescribed in California's sentencing scheme is not the upper term but rather the middle term.  (*Ibid*.)

Decisions by this court have further clarified the interplay between Sixth Amendment requirements and our determinate sentencing scheme.  *People v. Black* (2007) 41 Cal.4th 799 held in relevant part that imposition of the upper term does not violate a defendant's jury trial right "so long as one legally sufficient aggravating circumstance has been found to exist by the jury," or "has been admitted by the defendant." (*Id*. at p. 816.)  A companion case, *People v. Sandoval, supra,* 41 Cal.4th 825 (*Sandoval*), established that the erroneous imposition of an upper term is subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18.  (*Sandoval, supra*, at p. 838.)

In adding the firearm use enhancement to the sentence for the murder of Ricky Byrd, the court chose the aggravated term "because of the use of two firearms and multiple shots and lack of any provocation."  All of the identified aggravating factors were based on the evidence of the underlying crime, and none were established by the jury's verdict or admitted by defendant.  (*Sandoval, supra,* 41 Cal.4th at pp. 837-838, 839.)  We therefore agree with defendant that the court violated his federal constitutional right to jury trial when it imposed the upper term for this enhancement.

Defendant argues that the *Cunningham/Black* error was not harmless.  Under *Sandoval*, the pertinent inquiry is "whether, if the question of the existence of an

aggravating circumstance or circumstances had been submitted to the jury, the jury's verdict would have authorized the upper term sentence." (*Sandoval, supra*, 41 Cal.4th at p. 838.) "[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (*Id*. at p. 839.)

Contrary to defendant's assertion, we conclude beyond a reasonable doubt that the jury would have found true all of the aggravating circumstances stated by the court had they been charged and submitted to the jury for its consideration. Eyewitnesses to the Ricky Byrd murder testified consistently with one another that when defendant yelled to their group from the backseat window of the car, asking whether they would "give Smoke a message for him," Ricky approached the car and said, "Okay. What's the message?" They further testified that defendant then pointed two guns out the window and fired twice. Defendant did not dispute this evidence. Notably, he presented no defense case at the Byrd trial. Nor did counsel challenge the evidence during closing remarks. Indeed, in the course of arguing that defendant did not act with premeditation and deliberation, counsel asserted that defendant asked the group "quickly, just, 'Give Smoke a message,' and boom boom." Counsel also argued that defendant had no intent to kill but rather was firing madly at a parked car and happened to hit the victim as he was ducking down behind it for protection after seeing the two guns. Given the undisputed evidence regarding defendant's gun use, counsel's concessions, and that the jury convicted defendant of first degree murder rather than a lesser offense, we conclude beyond a reasonable doubt that, under the same standard, the

52

jury also would have found the aggravating circumstances that defendant used two firearms, fired multiple shots, and had not been provoked.[14]

### D. Constitutionality of California's Death Penalty Scheme

Defendant presents numerous challenges to the constitutionality of California's death penalty law that, as he acknowledges, are identical to those that previously have been considered and rejected by this court. We decline his request to reconsider our prior conclusions here. (*People v. Schmeck* (2005) 37 Cal.4th 240, 303.)

---

[14] The heading of defendant's claim of *Cunningham/Black* error in his opening brief refers to the court's imposition of upper term gun use enhancements relating to two counts, the Ricky Byrd murder and the robbery of Krystal Anderson. However, neither his opening brief nor the reply provides citation to the record or legal argument concerning the Anderson robbery. For this reason, we do not consider whether the court permissibly imposed the upper term enhancement in connection with that count. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1029 [if the appellate brief presents no legal argument on a point, the reviewing court may treat it as waived and decline to consider it]; *People v. Wilkinson* (2004) 33 Cal.4th 821, 846, fn. 9; *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

We agree with defendant, however, that the abstract of judgment should be corrected with regard to these two convictions and their gun enhancements, and respondent does not argue otherwise. The reporter's transcript indicates that, pursuant to section 654, the court stayed sentence on the Anderson robbery count and its associated enhancements. With regard to the Ricky Byrd murder count, it ordered that imposition of the gun use enhancement not be stayed. However, the abstract of judgment reflects a stayed sentence, rather than 10 years, for the enhancement on the Ricky Byrd murder count, and a term of 10 years, rather than a stayed sentence, for the enhancement on the Anderson robbery. When an abstract of judgment does not accurately reflect the trial judge's oral pronouncement of sentence, this court has the inherent power to correct such an error, either on our own motion or at the parties' behest. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Accordingly, we order that the abstract of judgment be corrected to conform to the sentences actually imposed by the court.

### 1. Aggravating and mitigating factors

Defendant asserts that California's capital sentencing statute, with its unitary list of aggravating and mitigating factors, fails to guide the sentencer's discretion in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and their state constitutional counterparts. We have concluded otherwise: Section 190.3 is not constitutionally infirm for not specifying which factors are aggravating and which are mitigating, for not limiting aggravation to the specified aggravating factors, or for not defining the terms "aggravation" and "mitigation." (*People v. Lee* (2011) 51 Cal.4th 620, 652; *People v. Horning* (2004) 34 Cal.4th 871, 913; *People v. Frye, supra*, 18 Cal.4th at p. 1026.) Nor do these asserted deficiencies impermissibly allow the jury to consider mitigating evidence, or its absence, in aggravation. (*People v. Jennings* (2010) 50 Cal.4th 616, 690; *People v. Page* (2008) 44 Cal.4th 1, 61.)[15]

Defendant further contends that section 190.3's aggravating and mitigating factors violate the Eighth Amendment's proscription against the use of vague factors in the penalty phase weighing process. (See *Stringer v. Black* (1992) 503 U.S. 222, 235.) We previously have rejected the same arguments defendant

---

[15] Defendant complains that section 190.3's deficiencies also improperly allowed the prosecutor to characterize his age as an aggravating factor and to argue nonstatutory matters as evidence in aggravation. He has forfeited this portion of his claim because he failed to object to the prosecutor's remarks. (*People v. Dykes* (2009) 46 Cal.4th 731, 794.) In any event, there is no merit to defendant's assertions. Age can be a factor in aggravation. (See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1349, fn. 25.) Furthermore, according to the record, the prosecutor told the jury that evidence of defendant's age is "not really an aggravating or mitigating factor." And although defendant complains that the prosecutor relied on a nonstatutory factor when urging the jury to choose death because defendant "is still part of society," the quoted remark does not appear in the reporter's transcript at the page number he cites, and our own review of the record discloses no such argument.

presents here: Section 190.3, factor (a), which permits consideration of the circumstances of the crime as an aggravating factor, is not impermissibly vague. (*People v. Mills* (2010) 48 Cal.4th 158, 213-214; *People v. Ervine* (2009) 47 Cal.4th 745, 810; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975-976.) Moreover, neither the use of the adjective "extreme" in "extreme mental or emotional disturbance" under factor (d), nor the absence of language explaining that these identified circumstances are mitigating rather than aggravating, renders that factor unconstitutionally vague. Nor does the same asserted deficiency invalidate factor (h), regarding impairment due to mental disease, defect, or intoxication. (*People v. Griffin* (2004) 33 Cal.4th 536, 598-599; *People v. Kipp* (2001) 26 Cal.4th 1100, 1138; *People v. Kelly* (1990) 51 Cal.3d 931, 968-969.) Finally, factor (i), the age of the defendant at the time of the crimes, is not unconstitutionally vague merely because it may be considered as a factor in aggravation or mitigation.[16] (*People v. Carrington* (2009) 47 Cal.4th 145, 201-202; *People v. Lucky* (1988) 45 Cal.3d 259, 302.) Defendant acknowledges that the high court upheld the constitutionality of factors (a), (b), and (i) in *Tuilaepa v. California, supra,* 512 U.S. 967. He asserts, however, that although discrete factors may appear constitutional, the combined effect of all factors renders the entire scheme unconstitutional. We have concluded to the contrary that section 190.3 as a whole is not impermissibly vague. (*People v. Seaton* (2001) 26 Cal.4th

---

**16** Defendant presents a catch-all argument, contending without any legal argument or explanation that all of the aggravating and mitigating factors are unconstitutionally vague and arbitrary, and that the jury's consideration of them results in unreliable sentences. We do not address the remaining factors. (*People v. Jones* (2003) 30 Cal.4th 1084, 1129; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 51, fn. 14 [a matter asserted in a perfunctory manner is not properly raised].)

55

598, 688; *People v. Box* (2000) 23 Cal.4th 1153, 1217; *People v. Williams, supra,* 16 Cal.4th at pp. 267-268.)

### 2. *Procedural safeguards*

"The jury need not make written findings unanimously agreeing on the existence of aggravating factors and concluding beyond a reasonable doubt that the aggravating factors exist, that they outweigh the factors in mitigation, and that death is the appropriate penalty." (*People v. Clark, supra,* 52 Cal.4th at p. 1007.) Nor is there a constitutional requirement that the jury be instructed on any burden of persuasion with regard to the penalty determination. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 328.)

California's automatic appeals procedure is not unconstitutional on the ground that it fails to provide for intercase proportionality review. (*People v. Garcia* (2011) 52 Cal.4th 706, 764.)

Prosecutorial discretion in deciding whether or not to seek the death penalty does not create a constitutionally impermissible risk of arbitrary outcomes that differ from county to county. (*People v. Bennett* (2009) 45 Cal.4th 577, 629; *People v. Keenan* (1988) 46 Cal.3d 478, 505.)

### 3. *Narrowing function*

The various special circumstances listed in section 190.2 that render a murderer eligible for the death penalty are not so numerous or broad that they fail to genuinely narrow the class of persons subject to capital punishment. (*People v. Vines, supra,* 51 Cal.4th at p. 891.) More specifically, the felony-murder and multiple-murder special circumstances adequately narrow the class of death eligible murderers. (*People v. Scott* (2011) 52 Cal.4th 452, 496, *People v. Solomon, supra,* 49 Cal.4th at p. 843; see also *People v. Boyer, supra,* 38 Cal.4th

at p. 483 [to categorize multiple murderers as especially deserving of the death-penalty is neither arbitrary nor irrational].)

That the jury may consider the special circumstance finding as an aggravating factor under section 190.3, factor (a), does not run afoul of the Eighth Amendment's narrowing requirement. "[T]he aggravating and mitigating circumstances referred to in section 190.3 do not and need not perform a narrowing function." (*People v. Cornwell, supra,* 37 Cal.4th at p. 102; see *People v. Mendoza, supra,* 24 Cal.4th at p. 192.) Nor does consideration of a special circumstance finding in aggravation permit the sentencer unbridled discretion that is weighted in favor of death. (*People v. Moon* (2005) 37 Cal.4th 1, 40-41; *People v. Kipp, supra,* 26 Cal.4th at p. 1137.) Nor does the use of a felony-murder special-circumstance finding as an aggravating factor subject the defendant to a greater likelihood of being sentenced to death than a defendant against whom some other special circumstance allegation has been found true. (*People v. Gates* (1987) 43 Cal.3d 1168, 1188-1189.)

### E. International Law

Defendant contends that the denial of his state and federal rights to due process and a fair and impartial trial in this case amounted to a violation of customary international law as informed by instruments such as the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the American Declaration of the Rights and Duties of Man, which requires that his convictions and sentence be set aside. We reject the assertion. "Because defendant has failed to establish prejudicial violations of state or federal constitutional law, we need not consider whether such violations would also violate international law." (*People v. Bolden* (2002) 29 Cal.4th 515, 567; accord, *People v. Wallace* (2008) 44 Cal.4th 1032, 1098.)

### F. Cumulative Effect of Asserted Errors

Defendant argues that the cumulative impact of the asserted errors at the guilt and penalty phases rendered his trial fundamentally unfair and deprived him of other constitutional rights. Because we have concluded there was no error related to the capital offenses or their punishment, there is nothing to cumulate and, in any event, we reject his claim that any asserted cumulative effect warrants reversal.

### III. CONCLUSION

We order that the abstract of judgment be corrected to conform to the trial court's oral pronouncement that the Penal Code section 12022.5, subdivision (a), gun use enhancement relating to count 1 (murder of Harry "Ricky" Byrd) is 10 years, and the Penal Code section 12022.5, subdivision (a), gun use enhancement relating to count 3 (robbery of Krystal Anderson) is stayed. The judgment is affirmed as so corrected.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

58

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Myles

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S097189
**Date Filed:** April 26, 2012

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Michael A. Smith


_____

**Counsel:**

John F. Schuck, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Annie Fraser, Jeffrey J. Koch and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John F. Schuck
Law Offices of John F. Schuck
4083 Transport Street, Suite B
Palo Alto, CA  94303
(650) 856-7963

Holly D. Wilkens
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2197