Filed 3/26/15  P. v. Netherly CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B254670 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA410664) |
| v. | |
| CHARLES WAYNE NETHERLY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard S. Kemalyan, Judge.  Affirmed.

Comar Law and D. Inder Comar under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb, Jonathan J. Kline and Garret A. Gorlitsky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found defendant Charles Wayne Netherly guilty of three counts of second degree robbery and one count of attempted second degree robbery.  The jury found true gang enhancements alleged as to each count.  On appeal, Netherly contends there was insufficient evidence to support the true finding on the gang enhancement as to count 2 (attempted robbery).  Netherly further argues the trial court erred in admitting evidence of his prior uncharged criminal conduct.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Around 4:00 p.m. on April 27, 2013, Bryan Simpson and two friends, Brandon White and Deonce Mosley, each purchased one ounce of marijuana at a dispensary in Los Angeles.  As they left the shop, Netherly and a group of men were standing outside.  Netherly and one other man approached.  Netherly asked White if he had marijuana.  When White said he did, Netherly demanded the marijuana.  White refused.  Netherly said, "We're shutting this shop down on '60's."  Simpson lived in the neighborhood and knew the area was claimed by the Neighborhood 60 Crips.  He understood Netherly's statement as one referring to the gang.  Other men who were with Netherly surrounded Simpson and his friends.  Mosley told White to give up the marijuana because "it's not worth it."  Netherly put his hand in White's pocket; White relented and gave Netherly the marijuana.  Simpson was concerned that if he did not turn over the marijuana, Netherly and those with him might have a gun or might "jump" him and his friends.  Mosley and Simpson gave Netherly their marijuana, then they three left.

At around 4:30 p.m. that same afternoon, Joseph Eagan was waiting for a bus across the street from the marijuana dispensary.  He saw a group of men outside a shop across the street from the bus stop.  Netherly called across the street, asking Eagan for the time.  Eagan consulted his phone and answered, "4:30."  Netherly left the group, crossed the street, and approached Eagan.  Netherly asked Eagan what kind of phone he had.  Eagan said he had the new LG cell phone.  Netherly responded, " 'Oh, well, I'm going to have to take that.' "  Eagan refused.  Netherly then said, " 'Well, I'm going to have to call

2

my homeys over here to come help me 'cause I'm going to beat you up.' "[1]  As Eagan tried to walk away, Netherly "puffed his chest" against Eagan's shoulder.  Netherly grabbed Eagan's shirt and repeated that he would have to beat him up.  Eagan was able to get around Netherly and run away.  When he looked back he saw Netherly's group crossing the street.  Eagan went home and told his mother what had happened.  She insisted they return to the bus stop.  Eagan and his mother called the police after they spotted Netherly and four or five other people on the next block.  Netherly was arrested.  As it happened, Simpson had returned to the marijuana dispensary to be reimbursed for the stolen marijuana.  He saw Netherly and his group being arrested.  Simpson told police the group had robbed him earlier that afternoon.

Los Angeles Police Officer Kevin Gaines testified as a gang expert.  Gaines described the area claimed by the Rolling 60's Neighborhood Crips gang (Rolling 60's), the gang's common symbols, and its primary activities.  He opined that Netherly was an active Rolling 60's gang member, along with two of the men arrested with Netherly in connection with the April 27 incidents.  Gaines testified generally that committing crimes benefits a criminal street gang.  He explained that property crimes generate money for the gang that may be used to buy narcotics or weapons, or to pay for bail or attorney fees.  He also testified that, in general, it benefits a gang when a gang member commits a crime with other gang members.  According to Gaines, such crimes instill fear in victims.  The more gang members present during the crime, the less likely the victim is to fight back.

Gaines further opined that gangs commit crimes "in broad daylight" because it benefits the gang by creating an atmosphere of fear in the community.  Such fear prevents people in the community from calling 911 or from retaliating.  He also explained that gangs make their name in the community by "tagging" or writing graffiti in the community, and by committing crimes.  Gang members "may or may not shout out and represent the gang."  Doing so acknowledges the gang and informs the victim of the gang

---

[1]      Although the trial court sustained defense counsel's objection to this testimony on the ground that it was not responsive to the question, there was no motion to strike the testimony.

the perpetrator is from. This allows the victim to "pass the word" about that particular gang.

The prosecutor presented Gaines with a hypothetical mirroring the facts of the robbery outside of the marijuana dispensary. Gaines opined the robbery would be committed for the benefit of the Rolling 60's gang. He explained that the crime would benefit the gang because gang members have to pay a "tax," when they commit crimes, and a certain percentage of the tax would go to the gang. The gang could then use such funds to purchase narcotics or weapons, or for bail money and attorney fees. However, he testified that if the robbery was of something small, the property taken might be for the personal use of the individual who took it. He further testified that a crime committed in broad daylight, in a well-trafficked area, would benefit the gang. Gaines explained: "The more crimes that are committed as well as the gang members that are together when a crime is committed, it's going to instill that fear and intimidation within the community."

Gaines opined that the statement, " 'we're shutting down this shop on 60's,' " would let the victim know the gang was committing the crime. It also indicated the gang was "claiming" the shop. This could mean the gang intended to extort a "tax" from the business owner, including by entering the business and "tak[ing] a certain percentage of the cash register due to fear and intimidation with no repercussions." It could also mean the gang was "excluding the businessman," and letting others know that persons caught patronizing the business would be subject to the gang "jam[ming] them up" and taking their property. Gaines also opined the crime would have been committed in association with members of the Rolling 60's because it was conducted in a group with at least three active gang members. He explained that having a group of people present would intimidate the victim, and would give a main perpetrator "back up." Committing a crime with other gang members would allow the perpetrator to have a witness to the crime so as to build his reputation, and everyone involved would get credit, regardless of his respective role in the crime.

4

The prosecutor presented Gaines with a second hypothetical mirroring the facts of the attempted robbery of Eagan.  Gaines testified the attempted robbery would also be committed for the benefit of the gang.  He explained:  "Again, it's going to benefit the gang due to the fact that the individual clearly made himself known as being a gang member, stated the common oath, shutting this down on 60's, presented the fact that he was a gang member within the Rolling 60's allowing the victim to know who he is and immediately going to instill the fear by taking the cellphone and possibly whatever else was on him.  [¶]  If accomplished, again, you know, the benefit of the gang is he's paying taxes and giving—possibly selling the phone or using it for additional crimes within a gang.  So it will benefit that way."

There was also evidence presented, over a defense objection, that in February 2011, Netherly told a police officer he had been at an auto wholesale location to steal batteries from the vehicles in the parking lot.  Netherly was not charged with a crime relating to the incident.

The jury found Netherly guilty on three counts of second degree robbery (Pen. Code, § 211), and one count of attempted robbery (Pen. Code, §§ 211, 664).  As to each count, the jury found true the allegation that the crime was committed for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b).  The trial court sentenced Netherly to a total prison term of 16 years.  This appeal followed.

## DISCUSSION

### I.    Substantial Evidence Supported the Gang Enhancement Finding on Count 2

Netherly contends the evidence was insufficient to support a true finding on the gang enhancement alleged as to count 2, the attempted robbery of Eagan.  He asserts there was no evidence the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang.  He further argues there was insufficient evidence that he had the specific intent to promote, further, or assist in any criminal conduct by gang members.  We disagree.

5

Under Penal Code section 186.22, subdivision (b)(1), a person convicted of a felony committed " '*for the benefit of, at the direction of, or in association* with any *criminal street gang*, with the specific intent to promote, further, or assist in any criminal conduct by gang members,' " is properly subject to additional punishment. (*People v. Margarejo* (2008) 162 Cal.App.4th 102, 106, 108.)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

Gang expert Gaines testified generally that when gangs commit crimes in "broad daylight," the actions benefit the gang because they create an atmosphere of fear in the community. As a result, community members are less likely to retaliate or involve the police for fear of retaliation. The gang expert further testified that a gang makes itself known within a community by, in part, committing crimes within the community. This was proper expert testimony the jury could rely on to determine whether Netherly's actions were for the benefit of the gang. (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*) [subject matter of culture and habits of criminal street gangs is appropriate for expert opinion testimony].)

The evidence established that before the attempted robbery of Eagan, Netherly and other gang members accosted and robbed Simpson and his two friends as they were exiting the marijuana dispensary. Netherly told the group: " 'We're shutting down this shop on the 60's,' " thus identifying the robbery as a gang crime. The gang expert

6

testified the statement meant the gang was "claiming" the shop. Netherly and other gang members had surrounded Simpson and his friends to forestall any resistance to the robbery. Simpson knew the area was claimed by the Rolling 60's gang; Gaines testified there was Rolling 60's graffiti in the area. Simpson also testified there was Rolling 60's graffiti in the alleys around the area, including near the marijuana dispensary. Only 30 minutes later, Netherly demanded Eagan's phone. When Eagan refused to hand over his phone, Netherly threatened to summon his "homeys" from across the street. The group did, in fact, cross the street to aid Netherly, but Eagan had already run away. After both the robbery and the attempted robbery, Netherly and his fellow gang members stayed in the area.

Although Netherly did not invoke the Rolling 60's name with Eagan, the jury could reasonably find that the brazen attempted robbery was a continuation of Netherly's efforts to benefit the gang by creating an atmosphere of fear and intimidation in the neighborhood on behalf of the Rolling 60's gang. The evidence also supported a finding that Netherly's attempted robbery of Eagan was for the benefit of the gang, in that it was a way to make the gang known in the community. Although the evidence could have been interpreted in several ways, one reasonable interpretation was that Netherly and his fellow gang members were on this particular intersection, making the gang's presence known to inspire fear in the community, by robbing people in broad daylight with impunity. Indeed, the evidence supported the prosecutor's theory that Netherly was projecting the image that "this is his corner. This is his territory."[2]

---

**2** The prosecutor argued both crimes were intended to gain notoriety, to control territory, to gain respect within the gang, and because Netherly and his associates were "repping their hood." Thus, "they commit this crime, these crimes in broad daylight. They do it with witnesses around and they don't even bother to leave because in their world, they're in charge, right? . . . [¶] . . . [¶] Mr. Netherly didn't so much as change his shirt . . . or even move off of the same corner that he was on in the 30 minutes after he robbed three people of their marijuana . . . . [¶] His conduct shows you . . . he wants everybody there to see and to know who he is and what he did."

7

Similarly, there was substantial evidence that Netherly had the specific intent to promote, further, or assist in criminal conduct by gang members. The enhancement "applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*Albillar*, at p. 68.) As explained above, Gaines testified that gang members commit crimes in a community to make the gang known, and may commit crimes in a brazen manner so as to intimidate the community and cause fear. In this case, the evidence showed Netherly and at least two other active gang members were hanging out in the area where the crimes occurred. The area was marked with graffiti of their gang. At least one of the gang members with Netherly had visible gang tattoos.[3] They robbed Simpson and his friends of their marijuana, invoking the gang's name with words suggesting their dominance over the marijuana dispensary.

After robbing Simpson and his friends, Netherly and the other gang members stayed near the shop. Then, Netherly attempted to rob Eagan, threatening to call over his "homeys" when Eagan resisted. The group crossed the street after Eagan ran away. Still, Netherly and the other gang members remained in the area. A reasonable jury could conclude from this evidence that Netherly attempted to rob Eagan with the intent to enhance the gang's reputation, to demonstrate to the community that the gang controlled that area, and to assist the gang by causing fear in the community. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1171-1172 (*Livingston*).)

On appeal, Netherly points out that the gang expert's opinion in response to the hypothetical mirroring the facts of count 2 was flawed in that it appeared to conflate the facts of the completed robbery and the attempted robbery. We agree for that reason that the expert's opinion in response to the hypothetical was not substantial evidence supporting the gang enhancement on count 2. However, that was only one portion of the expert's testimony. The remaining opinions regarding how criminal street gangs conduct themselves in general, the reasons why gang members commit crimes to benefit the gang,

---

[3]    The evidence established Netherly had multiple tattoos; Gaines testified several of them were gang related. However, it is not clear from the record before us if any of those tattoos were visible the day of the charged crimes.

8

and how committing certain crimes can benefit a criminal street gang, were valid. (*Vang, supra*, 52 Cal.4th at pp. 1050-1051.)

Further, although there was no evidence Eagan knew Netherly was a Rolling 60's gang member, or that Netherly invoked the gang when attempting to rob him, the jury could still find Netherly's actions were for the benefit of the gang, and that Netherly had the specific intent to promote, further, or assist criminal conduct by gang members. While a perpetrator's identification of himself as a gang member, or an invocation of the gang's name during the commission of the crime, is convincing evidence the crime was gang-related, the absence of such evidence does not render the crime per se beyond the reach of the gang enhancement. As explained above, although Netherly did not explicitly inform Eagan that the robbery was on behalf of the gang, there was still evidence the crime would benefit the gang, and that Netherly harbored the specific intent to promote, further, or assist criminal conduct by gang members.

In addition, while Netherly nominally carried out the attempted robbery on his own, when Netherly called across the street Eagan saw that he was with a group of other people, some of whom were in fact gang members. (See *People v. Rios* (2013) 222 Cal.App.4th 542, 574 [when defendant acts alone, the combination of the charged offense and gang membership alone is insufficient to support an inference on the specific intent prong].) Netherly crossed the street and accosted Eagan in full view of fellow gang members, he referred to them when threatening Eagan, and they came to his assistance when Eagan ran away. Gaines testified that gang members may commit crimes with other gang members present to instill fear in and intimidate the victim, to have a gang witness who can report back to the gang about the perpetrator's crime, and to "back them up." The jury could reasonably apply this portion of the expert's opinion to the facts of this case to conclude the attempted robbery was a gang-related crime.

*People v. Livingston, supra*, is instructive. In *Livingston*, the court considered whether substantial evidence supported gang enhancements connected with two crimes, a drive-by shooting and another shooting of security guards three months later. With respect to the drive-by shooting, the evidence showed the defendant, a gang member, was

9

in his car with two other members of the same gang when he fired the shots. The drive-by victim and two others with him were members of a rival gang. They were wearing the rival gang's colors. The court found the evidence supported true findings on both prongs of the enhancement. (*Livingston, supra*, 53 Cal.4th at p. 1171.) The court further found the evidence supported a finding that a subsequent shooting of security guards at an apartment complex was gang related, even though the guards were not gang members. The court cited evidence that the defendant's membership was a "major part of his life, as attested to by the many Crips gang tattoos he bore, and the fact that he had already committed a driveby shooting on behalf of the gang." (*Ibid.*) The defendant committed the shooting with a fellow gang member who was also with him at the drive-by shooting. The security guards had identified the defendant's car to the police after the drive-by shooting, and there was evidence the defendant was angry at least at one guard for helping to have the defendant's car impounded. Some of the guards on duty on the night of the shooting had also been on duty on the night of the earlier drive-by shooting.

Further, and particularly relevant to this case: "Evidence showed that the Park Village Crips considered the New Wilmington Arms apartment complex—the complex the security guards were guarding—to be their territory. The complex was covered with gang graffiti. Detective Richardson testified that criminal street gangs have the common goal to 'terrorize the public' by committing violent crimes. A reasonable jury could conclude from all this evidence that defendant shot the security guards to enhance the Park Village Crips's reputation, to show that the gang rather than the security guards were in charge of the apartment complex, or to retaliate for the guards' role in identifying his car in the earlier gang-related driveby shooting." (*Livingston, supra*, 53 Cal.4th at p. 1172.)

Likewise here, even if Eagan was unaware of the gang connection, a jury could reasonably conclude the entire set of circumstances indicated the attempted robbery of Eagan was gang related and gang motivated. These circumstances included the presence of multiple gang members; Netherly's commission of a gang-related robbery outside of the marijuana dispensary with words reinforcing the gang's control of the area; gang

graffiti in the area; Netherly's gang-related tattoos and the tattoos of those with him; the fact that Netherly and other gang members stayed at the same location after robbing Simpson and his friends; and Netherly's threats to bring his group over to assist him. A reasonable jury could conclude Netherly attempted to rob Eagan to enhance his gang's reputation, or to show that the gang controlled the neighborhood. We conclude substantial evidence supported the jury's true finding on the gang enhancement associated with count 2.

**II.     Any Error in Admitting Evidence of Netherly's Prior Uncharged Conduct was Harmless**

Netherly argues the trial court erred in admitting evidence of his prior uncharged criminal conduct. We need not decide the merits of this issue. Even if the court erred, it is apparent the error was harmless under any standard.

As noted above, a law enforcement officer testified that in February 2011, after being advised of his *Miranda* rights, Netherly said he had been at an auto wholesaler location, intending to steal batteries from the vehicles in the parking lot. He was not charged with a crime relating to the incident. No other details regarding the incident were provided at trial. Before trial, defense counsel objected to the evidence. The prosecutor argued it was admissible to prove intent. The trial court overruled the defense objection, concluding the evidence was admissible to prove intent, and it would not be unduly prejudicial.

Under Evidence Code section 1101, "[e]vidence of other crimes is not admissible merely to show criminal propensity, but it may be admitted if relevant to show a material fact such as intent. [Citations.] To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented. The least degree of similarity is needed when . . . the evidence is offered to prove intent." (*People v. Jones* (2011) 51 Cal.4th 346, 371 (*Jones*).) Evidence of other crimes that is admissible under Evidence Code section 1101 may still be inadmissible under Evidence Code section 352.

Even if the trial court erred in concluding the evidence was admissible in this case, we would not find the error reversible. The evidence against Netherly on the substantive offenses charged was overwhelming. Two victims testified Netherly robbed and attempted to rob them. The crimes were committed in broad daylight; both victims were in close proximity to Netherly. Both victims first identified Netherly to law enforcement at or near the scene of the crimes, not long after the incidents. These witnesses were unequivocal in their accounts of Netherly's conduct and his statements to them. There could be no doubt about Netherly's intent since he demanded that the victims hand over their property, and expressly or implicitly indicated violence would ensue if the victims refused. Netherly's invocation of his gang's name in carrying out the first robbery was a clear indication that the crime was gang related and gang motivated.

Although the evidence regarding the gang enhancement on count 2 may have been relatively weaker, the prior uncharged conduct was completely unrelated to any gang issue. The evidence that Netherly intended to steal car batteries from an auto wholesale lot did not suggest he had a propensity to engage in a gang-related crime. Moreover, the jury was instructed that they were only to consider the prior conduct evidence for the limited purpose of deciding whether Netherly acted with the necessary intent for robbery. The jury was instructed not to consider the evidence for any other purpose. (*People v. Hajek* (2014) 58 Cal.4th 1144, 1216 [presumption that jurors understand and follow instructions].)

The evidence of uncharged conduct was extremely brief, devoid of details, and far from inflammatory. There is no reason to believe the jury may have been tempted to convict Netherly on the charged crimes to punish him for his prior intention to steal car batteries from an auto wholesaler. It is not reasonably probable that a result more favorable to Netherly would have been reached had the court excluded evidence of his prior uncharged conduct. (*Jones, supra*, 51 Cal.4th at p. 372.) Further, even if a more stringent standard of error were appropriate, we would conclude it is beyond a reasonable doubt that the admission of the evidence did not contribute to the jury's verdict.

12

## DISPOSITION

The judgment is affirmed.

BIGELOW, P.J.

We concur:

FLIER, J.

GRIMES, J.