Filed 2/24/23  P. v. Solorio CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL RAY SOLORIO,<br><br>Defendant and Appellant. | F083181<br><br>(Super. Ct. No. F19903348)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Daniel Ray Solorio guilty as charged of first degree murder (Pen. Code, § 187, subd. (a)).[1]  It also found true an alleged gang enhancement (§ 186.22, subd.

---

[1]    All further statutory references are to the Penal Code unless noted otherwise.

(b)(5)).  Gang-related firearm enhancement allegations for personal and intentional discharge of a firearm causing death (§ 12022.53, subds. (d), (e)(1)) were found not true. Solorio pled guilty prior to trial to a misdemeanor count of destroying evidence (§ 135). Solorio was sentenced to 25 years to life in state prison.  The trial court gave Solorio credit for time served on the misdemeanor count.[2]

On appeal, Solorio contends: (1) jury instructions on his culpability were erroneous; (2) the gang enhancement finding must be reversed; and (3) the probation fee imposed must be vacated.  Respondent concedes that the gang allegation must be reversed and the probation fee vacated.  We accept these concessions, vacate the probation fee, and reverse and remand to allow the prosecution to retry the gang enhancement allegation, if it so chooses.  In all other respects, we affirm.

## STATEMENT OF THE FACTS

On the evening of May 17, 2019, David Corona took his cousin Jennie Calderon's silver Mazda 6 to "run fluids through" the car and pick up a soda for her.  Corona was a member of the Eastside Bulldog gang.

Cesar Porras worked at the AM/PM convenience store and gas station on Cherry and Jensen.  On the evening of May 17, 2019, a short dark-skinned Hispanic male wearing a red shirt, later identified as Corona, came in and bought a soda.  A video of the station's gas pumps showed a GMC pickup stopped at a pump and two men get out and walk into the store.  The two men, Madrigal, wearing a white shirt, and Solorio, wearing a dark blue shirt, were behind Corona as he was checking out.  Solorio was described as skinny, with braces on his teeth, wearing a blue shirt and driving a truck.  Porras

---

[2]     Solorio was tried with codefendant Jairo Madrigal, who was found guilty of special circumstance murder (§§ 187, subd. (a), 190.2, subd. (a)(21), (22)), and gang enhancement (§ 186.22, subd. (b)) and firearm enhancements (§ 12022.53, subds. (d), (e)) were found true.  Madrigal has filed a separate appeal (case No. F082856).

recognized Solorio as someone who came into the store about three times a week to get gas.

As Corona left the store, Madrigal lifted his right hand and pointed at Corona. Corona left the store in the Mazda, heading north on Cherry Street. The two men then left in the truck and also drove north on Cherry Street.

Karina Nava was driving on Jensen toward Cherry Street when she saw a truck come up from behind at a high rate of speed. As she turned left on Church Street, Ruiz looked in her rearview mirror and saw a small car and the truck both turned right. The truck pulled up on the left side of the small light-colored car while driving on the wrong side of the road. The truck then made a U-turn and the small car veered to the side of the road.

Devonna Burrus was driving east on Church Street when she saw a champagne or tan-colored truck and a white car almost collide. The truck's windows were down and there were two males inside. The truck spun out of control and then took off; the car hit a light pole on Church Street in front of the Gables Motel. Burrus stopped to see if she could help. She saw the car's rear windows were shattered and the driver, with a bullet lodged in the back of his head, was nonresponsive. Burrus had not heard any gunshots.

Luis Martinez was in a vehicle with his wife traveling east on Church Street, when he heard two to three gunshots and then saw a Mazda, which was traveling in the same direction, in the intersection of Church Street and Sarah Avenue. After hearing the gunshots, Martinez saw a truck, which was traveling westbound on Church Street, make a U-turn on Sarah Avenue and continue eastbound.

Police Officer Jose Garcia was dispatched to the scene of the crash at approximately 7:00 p.m. He found a silver Mazda crashed into a pole at the intersection of Church Street and Sarah Avenue. The rear window of the driver's side was shattered, and the windshield broken. The driver, Corona, who was deceased, was bleeding from

3.

the back of his head, and officers found two .40-caliber shell casings near the crash side, one on the roadway and one on the curb.

Surveillance videos from several businesses enroute from the gas station show the front passenger window of the truck down and the passenger wearing a white T-shirt. A video from another business shows the truck traveling at a high rate of speed as it catches up and passes by the side on Corona's car. In the AM/PM video taken earlier, the front passenger window in the truck was up.

None of the videos showed the truck's license plate number. A subsequent search on a vehicle identifier service found a truck owned by Jose Solorio that matched the description. Jose Solorio testified that his son, Daniel, drove the truck.

Jose Solorio identified the man in the surveillance video wearing a dark blue shirt as his son, Daniel. An officer identified the man in the white shirt as Madrigal, who had light skin, a goatee, and was wearing a black backwards ball cap with the letter "P." Madrigal had visible tattoos on his left wrist, left forearm, and back of his right arm. It was discovered that Madrigal worked on the day of the shooting, from approximately 6:00 a.m. to 2:30 p.m., but that he did not work the following day.

Solorio and Madrigal were both arrested days later. Solorio was arrested as he was getting in his truck. A cell phone was found in the truck and text messages extracted from May 17-19, 2019, showed texts with "LBB" on them, Madrigal's nickname of "Little Bam Bam." On the evening prior to the shooting, Solorio texted "Danny NSL" "Me and Bam on our way."

After the shooting, Solorio exchanged several messages with "Hoe 1". Solorio texted "Where the money, bro? I hella need some kind of money today." "Hoe 1" responded, "What happened to the 800, bro?" Solorio replied, "Some shit happened last night and I had to get rid of my truck and I need money, bro." Solorio sent "Hoe 1" a text message about a news story on the shooting of Corona. Solorio then texted, "Mother fuckers think they don't have to pay." "Hoe 1" replied, "Homeboy, what, you say you

4.

did that?" Solorio answered, "What you think, bro." "Hoe 1" asked, "Why did you do that?" Solorio replied, "Niggas think they don't need to pay homeboy. This shit ain't no game. Just because I don't live in the same town doesn't mean I won't look for whoever owes me. Feel me bro? Fuck that." "Hoe 1" asked, "Okay so what did you do with the truck?" Solorio answered, "It's gone bro, like completely ain't coming back at all."

Officers searched Solorio's residence and located a Pittsburg Pirates baseball cap that matched the cap worn by Madrigal in the AM/PM surveillance video. Officers found a gun case in the bedroom occupied by Solorio's brother, which contained a loaded gun magazine. Solorio's truck was swabbed, but the samples did not match Solorio or Madrigal. The only latent print identified belong to Solorio.

<u>Gang Evidence</u>

Oscar Torres, a senior investigator with the district attorney's office, testified as a gang expert that the Huron Parkside Norteños (HPN) is a subset of the Norteño gang in Fresno. As of May 17, 2019, HPN had at least 10 members. All of the Norteño subsets belong to the same gang and all pay taxes passed on to the Nuestra Familia prison gang, at the top of the Norteño gang hierarchy. In Fresno, the Sureños and Bulldogs are both rivals of the Norteños.

1.      *Predicate Offenses*

Police Officer Mark Wilcox testified as a gang expert, and described three predicate offenses committed by HPN gang members.

On January 1, 2015, Juan Orozco, an HPN, was convicted of murder with a gang enhancement. Officer Wilcox, who had had some contact with Orozco, opined that the crime was committed for the benefit of the gang. On October 18, 2012, Luis Solorio, an HPN and Solorio's uncle, was convicted of first-degree burglary. Wilcox opined that this crime benefited the gang because Luis Solorio stole an X-box and firearms, which are used by the gang. And on May 22, 2010, Iscander Madrigal, an HPN and Madrigal's older brother, was convicted of first-degree murder and active street gang participation.

5.

### 2. *Prior Police Contacts*

Various officers testified to numerous instances of prior contact with Madrigal between 2009 and 2018.

Prior police contacts with Solorio consisted of the following: Lemoore Police Officer Luke Tran worked at Lemoore High School from 2013 and 2016. During that time, he saw Solorio wearing a red rosary to school. Students were not permitted to wear red at school, so Norteño gang members often wore red rosaries.

On January 24, 2019, Investigator Oscar Torres contact Solorio in the company of another Norteño.

After Solorio's arrest in this case, officers took photographs of Solorio's tattoos, which included a "Fres Norte" tattoo on his upper chest and "HPN" on his stomach. An "H' was tattooed on Solorio's left wrist and an "N" tattooed on his right hand.

### 3. *Gang Expert Opinion*

Investigator Torres testified as a gang expert, and opined that both Madrigal and Solorio were HPN members.

Investigator Torres was given a hypothetical based on the facts of this case, and opined that the crime was committed in association with a criminal street gang since two gang members were acting together. Torres opined that the crime would benefit the gang by eliminating rival gang members and enhancing the gang's reputation. According to Torres, the Fresno Bulldogs outnumber the Norteños significantly and a crime such as this "sends a message to rivals that they're still here, they're still active and that they are not going away, that the war's still going on." Torres opined that "this promotes and furthers their gang because it helps with recruitment, it helps with operating more freely." Torres testified that violent acts discourage people from reporting crimes committed by the gang and discourages rival gang members from moving into their territory or otherwise threatening the gang's control. He also stated that the crime benefitted the specific gang members involved because "eliminating a rival gang member carries a lot

6.

of weight in that it gives that member a lot of respect because it's a tremendous – it's a very significant act."

## DISCUSSION

### I. ERROR IN JURY INSTRUCTIONS

Solorio makes several claims of jury instruction error. We address each separately and find no merit to his claims.

### A. Failure to Give CALCRIM No. 203 Was Harmless Error

Solorio was charged with first degree murder and the prosecution argued that Solorio aided and abetted Madrigal in the murder of Corona. Solorio contends that the trial court erred in failing to instruct the jury, sua sponte, with CALCRIM No. 203, which tells the jury to consider the evidence as to each charge for each defendant separately, and that his conviction must be reversed as a result of the error. Respondent argues that any error was harmless in light of other instructions given to the jury and the arguments of counsel at trial. We agree with respondent's argument.

In criminal cases, the trial court must, even in the absence of a request, instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Edwards* (1985) 39 Cal.3d 107, 117.) The general principles of law governing the case are those principles that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case. (*Ibid.*) In accordance with the foregoing, when multiple defendants are prosecuted in a single proceeding, the established case law requires the court to instruct the jury to separately consider the guilt or innocence of each defendant as to each charged offense. (*People v. Mask* (1986) 188 Cal.App.3d 450, 457 [discussing CALJIC No. 17.00].)

Here, although the court failed to so instruct the jury, we conclude that the error does not require a reversal of the judgment. (*People v. Mask, supra,* 188 Cal.App.3d at p. 457.) "[C]laims of instructional error are examined based on a review of the instructions as a whole in light of the entire record." (*People v. Lucas* (2014) 60 Cal.4th 153, 282,

7.

overruled on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1258.)

Here, the court's instructions to the jury included CALCRIM No. 220, which provides in relevant part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime beyond a reasonable doubt. [¶] … Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty." The jury was further instructed, in relevant part, with CALCRIM No. 224: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find a defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find a defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty." The court's instructions on the elements of murder (CALCRIM No. 520) required that, to prove guilt, the People had to prove "either or both defendants" acted with malice, and that "he or they" killed without lawful excuse or justification, wording that was repeated numerous times in the instruction. CALCRIM No. 521, continued this wording with the requirement that, if the jury decided "either or both defendants has committed murder," it then had to decide if it was first or second degree murder, again continuously referring to "either defendant."

We must presume the jury followed these instructions (*People v. Horton* (1995) 11 Cal.4th 1068, 1121), which collectively made clear that the prosecution was required to separately establish each defendant's culpability. Because the court's instructions were sufficient to effectively inform the jury that it had to separately assess Solorio's guilt, the trial court's failure to specifically instruct the jury in that regard will support a reversal of the judgment only if there is a reasonable (rather than merely theoretical) possibility that the instructional error affected the outcome of the trial. (Cal. Const., art. VI, § 13; *People*

8.

*v. Breverman* (1998) 19 Cal.4th 142, 165, 173; *People v. Mayo* (2006) 140 Cal.App.4th 535, 538-539, 541, 543-549.)

No such possibility is established in the record before us, as the arguments of all counsel (the prosecutor and both defense attorneys) reinforced that the guilt of each defendant had to be separately determined and the court provided the jury with separate verdict forms for Solorio, as well as instructions to consider "whether either defendant is guilty of first degree murder."  Under these circumstances, it is not reasonably probable that the jury would have found Solorio not guilty of murder if the omitted instruction had been given and thus the instructional error was harmless.  (Cal. Const., art. VI, § 13.)

B.  *Jury Instructions Were Legally Correct and Not Misleading*

As stated above, Solorio was charged with first degree murder on the theory that he aided and abetted Madrigal, who shot and killed Corona.  Solorio also contends that the trial court's instructions on murder were so ambiguous as to make it appear that if Madrigal was guilty of first degree murder, so was he.  We disagree.

The jury was instructed using pattern instructions that the murder charge required the prosecution to prove "either or both defendants" acted with malice aforethought, or intent to kill.  (CALCRIM No. 520.)  The jury was further instructed that "[e]ither defendant" could be convicted of first degree murder only "if the People have proved that he acted willfully, deliberately, and with premeditation."  (CALCRIM No. 521.)

Both parties agreed to the giving of CALCRIM Nos. 520 and 521; the defense raised no objections and asked for no modifications.  When a pattern instruction is correct as written, but the defendant suggests it needs a modification, he must so request in the trial court or he forfeits the issue on appeal.  (*People v. Buenrostro* (2018) 6 Cal.5th 367, 391; *People v. Mackey* (2015) 233 Cal.App.4th 32, 105-106.)

Nevertheless, Solorio now contends CALCRIM No. 520, as given, was misleading as it suggested that if one defendant committed murder, the other defendant did too.

9.

Solorio particularly has issues with the italicized portion of the last paragraph of the instruction as given, which states:

> "If you decide that either or both defendants committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that *it is murder of the first degree* as defined in instruction #521."

This wording, he contends "had the effect of lumping both defendants together in terms of their culpability for murder."

Solorio also contends CALCRIM No. 521, as given, was equally misleading. Again, he notes that, while the instruction refers to either or both defendants, the last paragraph states:

> "The People have the burden of proving beyond a reasonable doubt *that the killing was first degree murder* rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

As argued by Solorio, CALCRIM No. 521, as given, "muddled the requirements with regard to finding a defendant guilty of first degree murder" and conveyed that if either defendant committed murder, "the People's burden was just to prove that the killing itself was first degree murder, and that was sufficient proof to convict each defendant of first degree murder." Solorio contends the instructions were so confusing "that a reasonable juror would not have understood that the determination of whether a defendant was guilty of first degree murder depended solely on that defendant's mental state, not just on whether the killing itself was first degree murder."

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Given the presumption of correctness a judgment carries, we interpret the instructions " ' "to support the judgment rather than [to] defeat it." ' " (*People v. Mason* (2013) 218 Cal.App.4th 818, 825.) On a claim that the instructions are conflicting or ambiguous, " 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.

10.

[Citation.] We look to the instructions as a whole and the entire record of trial, including the arguments of counsel.' " (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.) We assume the jurors to be capable of understanding and correlating all the instructions given. (*Ibid.*)

We conclude the jury would not have understood the challenged instructions as Solorio contends. Examining the instructions as a whole and in the context of the entire trial record, we conclude they correctly state the law regarding murder. Contrary to Solorio's assertion, the instructions were not so ambiguous as to suggest that, if Madrigal was found guilty of murder, he was guilty as well. Instead, the given instructions, when considered in totality, clearly separate murder liability for each defendant.

Even if the challenged sentences in CALCRIM Nos. 520 and 521 were deemed ambiguous or incorrect, we could not find the instruction prejudicial, even assuming the standard of review for federal constitutional error would apply. (*Chapman v. California* (1967) 386 U.S. 18, 24.) It was clear from other instructions that the jurors had to agree unanimously that the elements of first degree murder had been proven before they could return a guilty verdict on first degree murder on each defendant separately. The jury reached its verdicts in a little less than two hours of deliberation. We are confident a change in the language complained of by Solorio would not have resulted in a more favorable verdict. The error, if any, was harmless beyond a reasonable doubt. (*Ibid.*) When viewed in context with accompanying instructions, the evidence in the record, and the arguments of counsel (see *People v. Young* (2005) 34 Cal.4th 1149, 1202), we are convinced beyond a reasonable doubt that Solorio was not prejudiced by the alleged ambiguity.

### C. *Order of Given Instructions Was Not Error*

We also reject Solorio's claim that, although aiding and abetting instructions were given, they were given late, not before or near the homicide instructions, exacerbating the other instructional errors. We find no merit to this claim.

11.

CALCRIM Nos. 400 and 401 on aiding and abetting were given towards the end of the reading of the instructions and not immediately following the instructions on murder.

Generally, the order in which jury instructions are given is immaterial and is left to the sound discretion of the trial court, and that discretion is not deemed abused absent a strong showing of prejudice. (*People v. Visciotti* (1992) 2 Cal.4th 1, 61; *People v. Carrasco* (1981) 118 Cal.App.3d 936, 942.) We have reviewed the order in which the instructions were given in this case and are satisfied that the order was logical and that no confusion was reasonably possible. (*People v. Visciotti, supra,* at p. 61.)

The instructions and argument of counsel made it abundantly clear that Solorio was being charged with murder under an aiding and abetting theory and not as the perpetrator. Moreover, the trial court provided a written copy of the jury instructions to the jury for use during deliberations. (§ 1093, subd. (f) [the court may, at its discretion, provide the jury with a copy of the written instructions given]; § 1137 [jury may take copies of the jury instructions into deliberations].) During deliberations, the jury is free to disassemble the instruction packet and sequence the instructions in any order they desire. Given the jury's ability to consider the instructions in any order they deem appropriate to their deliberations, the order in which the trial court reads the instructions to the jury takes on far less significance than Solorio espouses here.

We conclude there was no instructional error. But even assuming error, there was no prejudice warranting reversal.

II. GANG ENHANCEMENT

Solorio makes the contention that the enactment of Assembly Bill No. 333 (Assembly Bill 333), which amended section 186.22 and added section 1109 (Stats. 2021, ch. 699, §§ 3, 5) requires reversal of the gang enhancement found true here. The new law became effective January 1, 2022. (See Cal. Const., art IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).) Respondent concedes and we agree.

12.

### A. Overview

Section 186.22 prohibits unlawful participation in a criminal street gang, as set forth in subdivision (a), and includes sentencing enhancement provisions, at issue here, which are found in subdivision (b). (*People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7.) Ordinarily, a defendant convicted of murder and imprisoned for life may not be paroled until he has served a term of at least seven calendar years. For Solorio, who was convicted of murder, the additional gang enhancement required that he not be paroled until a minimum of 15 calendar years had been served.

A criminal street gang is "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)

A " 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of" two or more offenses listed in section 186.22, subdivision (e), if such conduct occurred within certain time frames and under particular circumstances specified therein. (§ 186.22, subd. (e)(1).) This is commonly known as the "predicate offenses" requirement. (*People v. Navarro* (2021) 12 Cal.5th 285, 311.)

The gang enhancement provision applies only to gang-related crimes, meaning offenses "committed for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)); accord *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) The enhancement penalty further requires "the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

By the enactment of Assembly Bill 333, section 186.22 has new requirements for establishing liability under subdivision (b). (Stats. 2021, ch. 699, § 3.) As of January 1, 2022, predicate offenses must be shown to have "commonly benefited" the alleged gang, and the common benefit must have been "more than reputational." (§ 186.22, subd. (e)(1).) Currently charged offenses no longer qualify (*id.*, subd. (e)(2)), and at least one predicate offense must have been committed "within three years of the date the current offense is alleged to have been committed ..." (*id.*, subd. (e)(1)). Among other additional changes, the terms "benefit," "promote," "further," and "assist" are now defined to mean providing "a common benefit to members of a gang where the common benefit is more than reputational." (*Id.*, subd. (g).)

B.       *Retroactivity of Amendments to Section 186.22*

Section 3 states that no part of the Penal Code is retroactive "unless expressly so declared." However, in *In re Estrada* (1965) 63 Cal.2d 740, an amendment to a criminal statute was held to apply retroactively despite the Legislature's failure to expressly declare such an intent. (*Id.* at pp. 742-745.) The rationale for this outcome has come to be known as the "*Estrada*" rule. (E.g., *People v. Frahs* (2020) 9 Cal.5th 618, 624.) In brief, "[w]hen new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 673.) Because there is no clear indication of legislative intent for prospective-only application, we conclude the amendments to section 186.22 apply retroactively in this case.

The People appropriately concede Solorio's argument for reversal of the gang enhancement. As discussed in their briefing, the trial evidence addressing the predicate offenses requirement, as chronicled above, was insufficient under the current version of section 186.22. "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an

14.

opportunity to retry the affected charges." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480; accord, *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822-823 & fn. 19.)

### III. PROBATION REPORT FEE

The trial judge ordered Solorio to pay the costs of preparing a probation report under section 1203.1b, in the amount of $296, to be paid "within 30 days of release from custody if that happens." Assembly Bill No. 1869 (2019-2020 Reg. Sess.) amended the Penal Code by adding section 1465.9, which provides, "On and after July 1, 2021, the balance of any court-imposed costs pursuant to Section … 1203.1b …shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2020, ch. 92, § 62.) This provision requires us to vacate the order imposing such fee.[3] (*People v. Clark* (2021) 67 Cal.App.5th 248, 260.)

### DISPOSITION

We vacate the true findings and strike the sentence enhancement imposed under section 186.22, subdivision (b), and remand the matter to afford the People the opportunity to retry this allegation in conformance with the current law. We also order the trial court to modify the judgment to vacate the probation fee of $296. The judgment is otherwise affirmed.

FRANSON, J.

WE CONCUR:

LEVY, Acting P. J.

MEEHAN, J.

---

[3]     We note that Solorio's abstract of judgment does not include mention of the probation fee.